IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE OFFICE

| | |
|---|---|
| LUMA HALIG,<br>160 S. Michigan Ave., Unit 1907<br>Chicago, IL 60605<br><br>*Plaintiff*,<br><br>v.<br><br>NATIONAL BOARD OF EXAMINERS<br>OF OPTOMETRY, INC.,<br>Serve: The Corporation Trust, Inc<br>2405 York Road, Suite 201<br>Lutherville Timonium, Maryland 21093<br><br>*Defendant*. | CASE NO. 1:22-cv-2118 |

**PLAINTIFF'S CIVIL COMPLAINT AND REQUEST FOR JURY TRIAL**

COMES NOW Plaintiff, LUMA HALIG, by and through her undersigned counsel, who files this Complaint against Defendant, the NATIONAL BOARD OF EXAMINERS IN OPTOMETRY ("NBEO"), and states as follows:

**NATURE OF THE ACTION**

1. This action challenges the discriminatory delay and denial of reasonable testing accommodations requested by Plaintiff, Luma Halig ("Dr. Halig"), on the Clinical Skills Examination ("CSE") administered by Defendant NBEO, which determines whether a candidate may be licensed to practice optometry in the United States.

2. The discrimination by NBEO has deprived Dr. Halig, a person with multiple documented disabilities, from successfully passing the CSE and thereby becoming licensed to practice optometry. These discriminatory actions, which are ongoing, violate the Americans with Disabilities Act. Immediate and permanent injunctive relief is necessary to correct these violations.

1

## JURISDICTION AND VENUE

3. Dr. Halig's claims arise under the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, *et seq.* (the "ADA").

4. This Court has subject matter jurisdiction based on a federal question under 28 U.S.C. §§1331 and 1343(a).

5. This Court further has jurisdiction over this action under 28 U.S.C. § 1332, as the case involves a civil action between citizens of different states and the sum in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) and further relief pursuant to 28 U.S.C. § 2202.

7. This Court has jurisdiction over the NEBO because it is incorporated in Maryland and avails itself to Maryland.

8. Under 28 U.S.C. § 1391, venue is proper in this judicial district because the NBEO is a resident of this District.

## PARTIES

9. Dr. Halig is a 2020 graduate from the Illinois College of Optometry ("ICO"), located in Chicago, Illinois. She resides in the State of Illinois.

10. Dr. Halig is diagnosed with and affected by learning disabilities, including specific learning disorders with impairments in reading and mathematics, as well as severe attention deficit hyperactivity disorder ("ADHD") and adjustment disorder.

11. Dr. Halig is a person with a disability under the ADA and is entitled to federal protection and appropriate accommodations.

12. Defendant NBEO is a privately held not-for-profit corporation. It is incorporated in Maryland with its principal office located at 2405 York Road, Suite 201, Lutherville Timonium,

MD, 21093, and maintains its principal place of business in North Carolina at 200 S. College Street, Suite 2010, Charlotte, North Carolina, 28202.

13.     The NBEO is the national testing organization in the field of optometry in the United States, and it creates and administers various exams in the optometry profession, including the CSE.  As such, the NBEO is subject to the non-discrimination and reasonable accommodation requirements of the ADA.

## FACTUAL ALLEGATIONS

14.     Dr. Halig is a 2020 graduate of ICO.  As many other students did, Dr. Halig sought to take the three Parts of the NBEO optometry certification examination offered through the NBEO in 2020.

15.     The NBEO's optometry certification examination purports to assess the competence of potential optometrists, and results on this test is a mandatory precursor to obtaining are one of the multiple requirements for a professional optometry license.

16.     In order to obtain a professional optometry license in the United States, candidates must pass all three parts of the NBEO optometry certification examination, including Part One: Applied Basic Science ("ABS"); Part Two: Potential Acuity Meter ("PAM"); and Part Three: Clinical Skills Examination ("CSE").

17.     Parts One and Two of the exam consist of several hundred multiple-choice scored items, which take several hours to complete, and Part Three consists of a candidate's demonstration of clinical skills that purport to simulate actual optometry practice.

18.     Part Three of the examination consists of four stations in which the first three stations are timed for thirty minutes, and the fourth station is timed for only fifteen minutes.

19.     Despite the structure of Part Three of this examination, Optometrists are not timed in the delivery of their services in the profession.

20. Despite the structure of Part Three of this examination, artificial time limits are not a part of the skill and practice of Optometry.

21. The NBEO has available online its "Test Accommodations" policies and procedures, which outlines the documentation the NBEO requires for test-takers to request accommodations on the examination. The NBEO's website states that a candidate's functional limitations will determine the appropriateness of any test accommodations.

22. The NBEO's policies and procedures, as applied in the context of Dr. Halig, are insufficient and result in violations of applicable law.

A.   **DR. HALIG'S DISABILITY DIAGNOSES AND ACCOMMODATIONS**

23. Dr. Halig has been diagnosed with multiple disabilities, including ADHD; specific learning disorders with impairments in reading and mathematics; and adjustment disorder, with mixed anxiety and depressed mood.

24. Despite being an individual with multiple disabilities, Dr. Halig has succeeded and persevered in her chosen course of study.

25. Dr. Halig has been diagnosed with several disabilities by multiple different medical professionals over the years.

26. During her undergraduate studies, Halig received reasonable accommodations which included extended time on tests, a quiet separate testing room, use of a note-taker, and extra breaks as needed.

27. In 2008, prior to taking the GRE and entering graduate studies, Dr. Halig sought and received further evaluation of her disabilities from Dr. Greenaway.

28. Dr. Greenaway evaluated Halig with "significant impairments in working memory, visual sustained attention, and mathematics fluency," as well as challenges with "reading fluency and rate" and "symptoms of significant anxiety and depression."

29. At the time, Dr. Greenaway diagnosed Halig with ADHD (Inattentive Type), Mathematics Disorder, Depressive Disorder Not Otherwise Specified, and Generalized Anxiety.

30. Also at the time, Dr. Greenaway recommended several accommodations in order to allow Dr. Halig to demonstrate her capabilities. Those accommodations included preferential seating, reduced workload, extended time (100% on mathematics, 50% time on other tasks), extra breaks, provision of visual aids, and permission to record classroom lectures.

31. Following Dr. Greenaway's evaluation, Dr. Halig received accommodations for the Graduate Record Exam ("GRE") including extra breaks totaling 30 minutes and 150% (time and a half) testing time on the Essay Argument, Essay Issue, Verbal Computer Adaptive, and Quantitative Computer Adaptive portions of the GRE.

32. Prior to beginning her studies at the Illinois College of Optometry, Dr. Halig was evaluated by Dr. Duncan in 2013.

33. In the course of the 2013 examination, Dr. Duncan concluded that Dr. Halig was "continuing to experience clinically significant problems with inattention, hyperactivity, impulsivity, disorganization, and general difficulties with learning."

34. Dr. Duncan maintained the previous diagnoses of ADHD (Inattentive type) and Mathematics Disorder for Dr. Halig.

35. In addition, Dr. Dungan recommended reasonable accommodations including preferential seating, extended time (ranging from time-and-a-half to double time), extra breaks, and a provision of combined visual and verbal aids.

36. Prior to entering the Illinois College of Optometry, Dr. Halig sought accommodations on the Optometry Admissions test. The Optometry Admissions test, created by the Association of Schools and Colleges of Optometry, is designed to give the means to assess an applicant's potential for success in graduate optometry education and the practice of optometry.

37. Due to her documented disabilities, Dr. Halig obtained double time and separate room accommodations for the Optometry Admissions test.

38. In the course of her studies with the Illinois College of Optometry, Dr. Halig underwent an extensive psychoeducational evaluation conducted by Dr. Joshua Wolff in 2017.

39. Dr. Wolff diagnosed Dr. Halig with the following disabilities:

**DSM-5 Diagnostic Impressions**

314.00 Attention-Deficit/Hyperactivity Disorder (Predominantly inattentive presentation), severe

315.1 Specific Learning Disorder, with impairment in Mathematics, moderate, noted by problems with (1) Accurate or fluent calculation; and (2) Accurate math reasoning

315.00 Specific Learning Disorder, with impairment in Reading, moderate, noted by problems with: Reading rate

209.28 Adjustment Disorder, with mixed Anxiety and Depressed Mood

40. Dr. Wolff's evaluation concluded that Dr. Halig had "significant problems with attention, impulsivity, auditory working memory, and mathematics/reading fluency demonstrated throughout this evaluation and previous evaluations" and concluded that Dr. Halig "qualifies for educational and testing accommodations under the ADA."

41. Dr. Wolff recommended the following accommodations:

1. Extended time on any evaluation procedures. She needs double-time (+100% time) for all academic work, including exams, laboratory exercises, graded materials, and homework assignments. Because her fluency deficits were especially pronounced on mathematical fluency subtests, this seems especially relevant in the field of Optometry that she be given sufficient time to demonstrate her actual knowledge of and skill proficiency. The request for extended time is strongly substantiated by the test results which indicate clinically significant problems with auditory working memory, math fluency, reading fluency, and inattention. Of note, these indicators are 1-2 standard deviations below the mean in comparison to adults her age.

   a. This is especially needed on exams which have multiple components/subjects and require heavier demands on executive

6

      functions (*e.g.*, switching, inhibiting, monitoring, and sustaining attention), such as the NBEO exam.

2. Allow [Dr. Halig] additional breaks, as needed, in order for her to sustain attention and concentration during classes, labs, and exam.

3. Allow the use of pencil and paper, or another form of writing notes.

4. Preferential seating to minimize distractions, if requested by [Dr. Halig].

5. Completion of exams or lab evaluations in a separate, quiet room with minimal distractions.

6. Allow [Dr. Halig] to register for classes early so that she can create a schedule that maximizes flexibility and breaks, which are needed to improve attention.

7. Permission to record spoken lectures and labs in order to review materials that may have been missed due to inattention and working memory weaknesses.

8. Copies of notes provided in advance so that [Dr. Halig] can follow along, rather than trying to write quickly or memorize the auditory material and then falling behind in class/lab. This could also help [Dr. Halig] recognize visual images in class/lab that she has seen before, which is a strength that could compensate for auditory weaknesses.

9. Use of headphones or ear plugs to reduce auditory distractions.

10. Use of reading software, when needed, due to attention problems and tests data which demonstrated her ability to improve her memory performance when being able to hear something multiple times.

42. In accordance with the diagnosis of Dr. Wolff, Dr. Halig received accommodations throughout her studies at the Illinois College of Optometry, including the following:

1. double time for examinations;

2. the use of a "reader" for examinations; and

3. private testing space for examinations;

43. Notably, the Illinois College of Optometry also gave Dr. Halig "additional time (up to double time) for clinical skills assessments or practical exams."

7

44. In doing so, the Optometry professionals of the Illinois College of Optometry concluded that granting additional time for clinical or practical examinations would neither create an undue burden nor fundamentally alter the measurement of the skills or knowledge the practical examinations and clinical assessments were intended to test.

45. Due to her multiple documented disabilities, Dr. Halig has multiple disorders that substantially limit one or more major life activities.

46. Due to her multiple documented disabilities and limitations, Dr. Halig requested testing accommodations as required by the NBEO's policies and procedures.

47. At the NBEO's request, Dr. Halig cooperated by providing any documentation requested and providing the NBEO with the contact information from university officials that had previously provided Dr. Halig with testing accommodations during her time at ICO.

48. In support of her request to the NBEO for accommodations on each part of the NBOE examination, including the CSE, Defendant received, among other things, the entire Wolff evaluation and documentation of the accommodations Dr. Halig received at ICO.

**B.   THE NBEO'S DENIAL OF DR. HALIG'S REQUEST OF REASONABLE ACCOMMODATIONS**

49. When considering Dr. Halig's request, NBEO did not give the appropriate "considerable weight to documentation of past…accommodations".

50. Despite having evidence of multiple professional evaluations and diagnoses of disabilities, explicit recommendations from a medical provider on what accommodations were necessary for Dr. Halig to demonstrate her capabilities on the examination, and actual examples of what educational institutions and Optometry professionals deemed appropriate accommodations for Dr. Halig, the NBEO was not satisfied.

51. Notably, the NBEO sought additional confirmation from Dr. Wolff's report, including reaching out to other professors within ICO.

52. The NBEO's process was so extensive and time-consuming that Dr. Halig was initially unable to take the CSE because the NBEO had not finished its evaluation of her documentation.

53. Specifically, Dr. Halig applied for her accommodations in November 2018 but did not receive substantive feedback from NBEO until February 2019.

54. Even at that point, the testing center was unable to schedule the examination with the accommodations for the first two parts of the CSE in Dr. Halig's geographical area. Consequently, Dr. Halig was forced to defer her examination.

55. In August 2020, Dr. Halig was shocked and troubled to learn that she would not be receiving all of the accommodations sought.

56. After evaluating Dr. Halig's extensive documentation, the NBEO ultimately in August 2020 granted double time for Part I: (ABS) and Part II ( PAM) of the professional examination. The NBEO refused, however, to grant Dr. Halig's requested accommodation for Part III (CSE).

57. Specifically, Rick Present, ADA Coordinator for the National Board of Examiners in Optometry, stated "in looking at all the documentation, I do not see sufficient evidence to award you extra time for any station for the Part III exam."

58. In the denial, Mr. Present claimed that "time is considered to be an integral component for Part III," apparently asserting that "it is very rare that we offer extra time for any station on the Part III exam."

59. Mr. Present's response did not claim that granting the accommodation would be an "undue burden."

60. Upon information and belief, based upon the reference to "very rare" situations, NBEO has granted extra time to other applicants for the Part III examination.

9

61. Mr. Present's response did not articulate any concerns for the safety of the "patients" that would be assisting in the examination process due to the grant of the requested additional time.

62. As a purported alternative, the NBEO offered to either rearrange the placement of the 4 portions of Part III, or to give modestly longer breaks (fifteen minutes instead of the four or five other examinees experience) between the 4 portions of Part III.  However, in doing so, NBEO warned that accepting the options may result in limits to Dr. Halig's ability to find a test date.

63. In spring 2021, after substantial delays due to NBEO's extended evaluation of Dr. Halig's accommodation request, Dr. Halig finally got to take the NBEO examination.

64. Dr. Halig passed Part One: ABS and Part Two: PAM, of the NBEO examination.

65. However, Dr. Halig did not fully pass Part Three: CSE, for which the NBEO refused to grant Dr. Halig's requested accommodations for extra time and breaks.  Of the four stations in Part Three, Dr. Halig passed stations one and three, but she ran out of time on stations two and four.

66. During her practicum at ICO, Dr. Halig passed Part Three of the simulated examination when she was provided with the accommodations she requires.  Without those accommodations, the NBEO results for Part III reflected Dr. Halig's disability and not her true capabilities.

67. Dr. Halig requires the full additional time and breaks recommended by Dr. Wolff for the NBEO exam, including Part III, as those accommodations would best ensure that the exam results reflect Dr. Halig's aptitude and not her disabilities.

68. Simply put, Dr. Halig's functional limitations impact her ability to take a timed clinical examination in a way that non-disabled test takers simply do not experience.

69. As demonstrated by ICO, the grant of additional time in clinical and patient settings neither fundamentally alters the measurement of skills necessary to be a professional optometrist nor creates an undue burden on the administrator of the examination.

70. If Dr. Halig does not receive the requested reasonable accommodations on Part III: CSE, she will be unable to fully demonstrate her actual knowledge, skills, and potential to succeed on Part III: CSE.

71. If Dr. Halig does not take Part III: CSE with appropriate accommodations, she will be irreparably harmed because she will lose the extensive time, effort, and financial resources she has invested in becoming an optometrist.

72. The accommodations requested by Dr. Halig, including extra time and scheduled breaks, are reasonable and do not present an undue burden for the NBEO because the NBEO can take measures to mitigate any safety concerns while still providing Dr. Halig with appropriate accommodations.

**FIRST CAUSE OF ACTION**

**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. §§ 12101 *ET SEQ*.**

73. Dr. Halig hereby realleges paragraphs 1-72 and incorporates the allegations by reference the previous paragraphs of this Complaint as if realleged fully herein.

74. Dr. Halig has physical or mental impairments that substantially limit one or more of her major life activities, including but not limited to reading, learning, concentrating, and thinking.

75. Dr. Halig is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102, as amended.

76. Dr. Halig is a qualified individual within the meaning of the ADA in that she meets all the eligibility criteria for taking the NBEO optometry certification examination.

77. Dr. Halig requires reasonable accommodations to participate in a fair, full, and equal basis on the NBEO optometry certification examination.

78. Specifically, with respect to the Part III portion of the NBEO examination, Dr. Halig requires extra time and the ability to have breaks in order to demonstrate her aptitude during Part III of the exam, akin to the accommodations NBEO approved and allowed for Parts I and II of the exam.

79. The modifications that Dr. Halig needs would not impose a fundamental alteration of the examination but would attempt to level the field and allow her aptitude and abilities to be fairly and accurately measured.

80. Defendant NBEO administers the NBEO optometry certification examination, an examination related to applications and credentialing for postsecondary education, professional, and trade purposes, within the meaning of the ADA.

81. The ADA, 42 U.S.C. § 12189, requires the NBEO to offer these examinations in a manner accessible to persons with disabilities.

82. The Department of Justice Regulations interpreting the ADA mandate that a private entity offering examinations modify its examinations as necessary to ensure full and equal access to persons with disabilities, including through the provision of extra testing time to permit completion. 28 C.F.R. § 36.309(b).

83. Department of Justice regulations require that testing entities such as NBEO must make only "reasonable and limited" requests for documentation of the disability and desired accommodations. 28 C.F.R. § 36.309(b)(1)(iv).

84. Department of Justice regulations require testing entities such as NBEO to respond "in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities." 28 C.F.R. § 36.309(b)(1)(iv).

85. The Department of Justice regulations interpreting the ADA state that testing entities such as NBEO "shall generally accept" "documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation or aid requested…and provide the accommodation". Nondiscrimination on the Basis of Disability, 75 Fed. Reg. at 56,297.

86. Implementing regulations further provide that "considerable weight" should be given to past testing accommodations. 28 C.F.R. § 36.309(b)(1)(v).

87. NBEO had notice of Dr. Halig's disabilities and need for reasonable accommodations in the testing process.

88. NBEO had notice of the accommodations sought by Dr. Halig in the testing process.

89. The NBEO has discriminated, and continues to discriminate, against Dr. Halig based on her disability by denying her an equal opportunity to demonstrate her aptitude and achievement level on the NBEO optometry examination in violation of the ADA, specifically, 42 U.S.C. § 12182.

90. The NBEO's discriminatory practices violate Dr. Halig's rights under the ADA and the regulations promulgated thereunder. The NBEO's discriminatory policies and practices include:

(a) Failing to timely consider and render a determination on the request for accommodations.

(b) Making extensive and lengthy requests for documentation, rather than "reasonable and limited" requests as required by the law.

(c) Failure to give considerable weight to the recommendations and determinations of Dr. Halig's evaluators.

(d) Failure to give appropriate deference and weight to Dr. Halig's prior approval and use of accommodations in school, in standardized examinations, and in clinical and practical examinations.

  (e) Failure to provide a clear explanation for the NBEO's denial of reasonable accommodations.

  (f) Failure to grant the accommodations required by Dr. Halig, even after she had submitted ample documentation and necessity for the same.

91. Dr. Halig has been damaged by the discriminatory conduct of Defendant.

92. The NBEO's conduct constitutes an ongoing and continuous violation of the ADA. Unless enjoined from doing so, the NBEO will continue to violate said law and cause injury for which Dr. Halig has no adequate remedy at law. Consequently, Dr. Halig is entitled to injunctive relief under the ADA, 42 U.S.C. § 12188.

## SECOND CAUSE OF ACTION

## DECLARATORY RELIEF

93. Dr. Halig hereby realleges paragraphs 1-92 and incorporates the allegations by reference the previous paragraphs of this Complaint as if realleged fully herein.

94. A present and actual controversy exists between Dr. Halig and the NBEO concerning their rights and respective duties.

95. Dr. Halig contends that the NBEO violated and continues to violate her rights under the ADA.

96. Based upon information and belief, the NBEO denies these allegations, and thus declaratory relief is therefore necessary and appropriate.

97. Dr. Halig seeks a judicial declaration of the rights and duties of the respective parties accordingly.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Halig prays for judgment as follows:

a) Preliminary order compelling the NBEO, or those acting as agents for or in concert with it, to provide reasonable accommodations to Dr. Halig, by providing her with the reasonable accommodations on the next available administration of Part Three: CSE of the NBEO optometry

examination, which accommodations shall include: extra time (double time) on each of four stations and appropriate as-needed breaks between each section of the Part Three: CSE;

      b)      Preliminary order compelling the NBEO to report and certify Dr. Halig's score on the Part Three: CSE of the NBEO examination administration once taken with the above accommodations;

      c)      An order making the above orders permanent and that such orders be made applicable to all future examinations, if any, administered by the NBEO and taken by Dr. Halig;

      d)      An order granting such injunctive relief as may be appropriate;

      e)      An order granting declaratory relief;

      f)      An order awarding Dr. Halig her attorney's fees, costs, and expenses of suit incurred herein; and

      g)      An order awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demand a trial by jury.

DATED this 22nd day of August, 2022.

                              Respectfully Submitted,

                              **LAW OFFICE OF KIM PARKER, P.A.**

                              */s/ Kim Parker, Esq.*
                              KIM PARKER, ESQ.
                              Federal Bar No.: 23894
                              2123 Maryland Avenue
                              Baltimore, MD 21218
                              Telephone: 410-234-2621
                              Facsimile: 410-234-2612
                              Email: kp@kimparkerlaw.com
                                          and
                              **THE BACH LAW FIRM, LLC**
                              JASON J. BACH, ESQ.
                              *Pro Hac Vice Admission Pending*
                              7881 W. Charleston Blvd., Suite 165
                              Las Vegas, Nevada 89117
                              Telephone: (702) 925-8787
                              Facsimile: (702) 925-8788
                              Email: jbach@bachlawfirm.com
                              *Attorneys for Plaintiff*