## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| LUMA HALIG, | * |
| Plaintiff, | * |
| v. | * |
| NATIONAL BOARD OF EXAMINERS OF OPTOMETRY, INC., | *   Civil No. 22-2118-BAH |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM OPINION**

Plaintiff Luma Halig ("Plaintiff") brought this suit against Defendant the National Board of Examiners of Optometry, Inc. ("Defendant"), alleging that it violated her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* ECF 1. Pending before the Court are Defendant's motion for summary judgment, ECF 36, and Plaintiff's cross motion for summary judgment, ECF 45. Also pending are several motions relating to expert testimony in this case: Plaintiff's Motion to Strike Defendant's Expert Designation of and Preclude Testimony from David Damari, O.D.[1], ECF 43; Defendant's Motion to Strike the Report and Testimony of Putative Expert Witness Jamie Axelrod, ECF 52; and Defendant's Motion to Strike Joshua Wolff's, Scott Greenaway's, and Scott Duncan's Evaluations, ECF 51. All motions are fully briefed, and all filings include memoranda of law and exhibits.[2] *See* ECFs 44, 46, 49, 50, 52, 55–62. The Court

---

[1] The designation "O.D." stands for "doctor of optometry." *What's a doctor of optometry?* American Optometric Association, https://www.aoa.org/healthy-eyes/whats-a-doctor-of-optometry? (last visited June 13, 2024).

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendant's motion for summary judgment, ECF 36, is **DENIED**; Plaintiff's motion for summary judgment, ECF 45, is **DENIED**; Plaintiff's motion to strike the expert testimony of Dr. Damari, ECF 43, is **GRANTED in part** and **DENIED in part**; Defendant's motion to strike the report and testimony of Mr. Axelrod, ECF 52, is **GRANTED in part** and **DENIED in part**; and Defendant's motion to strike the evaluations of Dr. Wolff, Dr. Greenaway, and Dr. Duncan, ECF 51, is **DENIED**.

## I.   **BACKGROUND**

As with many professions, in addition to completing an advanced degree, optometrists must take and pass a licensing exam before they can practice. *See* ECF 36-2, at 2–3 (explaining Defendant's role in licensing optometrists). The optometry licensing exam (the "NBEO exam") is administered by Defendant and is comprised of three components: two multiple choice components and one clinical skills component known as the "Clinical Skills Examination" ("CSE"). *Id.* at 3. Candidates must pass all three components in order to be licensed. *Id.* at 3–4. This case arises from Plaintiff's attempts to receive disability accommodations on the CSE. ECF 1, at 10–11.

Plaintiff graduated from the Illinois College of Optometry in 2020 with a Doctor of Optometry degree. ECF 45-3, at 11, 37:7–8. Plaintiff has been diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD"), Adjustment Disorder, and learning disorders in math and reading, and as a result, she received disability accommodations throughout her time at the Illinois College of Optometry. ECF 46-1, at 26 (outlining Plaintiff's diagnoses); ECF 45-3, at 5–6, 13:5–15:15 (explaining that Plaintiff received "time and a half" for her exams and other accommodations during her first years at optometry school); *id.* at 31–32, 117:6–118:4 (explaining that Plaintiff later received "double time" accommodations for her exams and assignments). This

2

included "additional time (up to double time) for clinical skills assessments or practical exams." ECF 45-8, at 101. She also received accommodations on previous standardized tests, such as being granted "time and a half" on the Graduate Records Examinations ("GRE"). ECF 45-7, at 2.

When it came time for Plaintiff to take the NBEO exam, she applied for accommodations related to her disabilities. ECF 45-23, at 130–141. In so doing, she attached and relied upon an evaluation completed by psychologist Dr. Joshua Wolff in 2017 that diagnosed Plaintiff with ADHD, learning disabilities related to math and reading, and Adjustment Disorder. *See id.* at 145– 183; *see also id.* at 130–141 (showing requests for accommodations on NBEO exam referencing an attached evaluation). Dr. Wolff recommended that Plaintiff receive academic accommodations of, as relevant here:

> a. Extended time on any evaluation procedures. She needs double-time (+100% time) for all academic work, including exams, laboratory exercises, graded materials, and homework assignments. Because her fluency deficits were especially pronounced on mathematical fluency subtests, this seems especially relevant in the field of Optometry that she be given sufficient time to demonstrate her actual knowledge and skill proficiency. The request for extended time is strongly substantiated by the test results which indicate clinically significant problems with auditory working memory, math fluency, reading fluency, and inattention. Of note, these indicators are 1-2 standard deviations below the mean in comparison to adults her age.
>
> > i. *This is especially needed on exams which have multiple components/subjects and require heavier demands on executive functions (e.g., switching, inhibiting, monitoring, and sustaining attention), such as the NBEO exams.*

*Id.* at 171–72 (emphasis in original).

Plaintiff applied for accommodations on the multiple-choice components of the exam in between 2018 and 2020. ECF 45-23, at 132–39 (showing Plaintiff's request for accommodations on part one); ECF 45-23, at 130–31 (showing Plaintiff's request for accommodations on part two). Richard Present, the ADA Coordinator for Defendant at the time, reviewed Plaintiff's requests for

accommodations and asked Defendant's external consultant, Dr. Kathryn Bugbee, for her opinion on the accommodation request. ECF 36-5, at 2–5. Mr. Present, with input from Dr. Bugbee, granted Plaintiff's requests for accommodations for parts one and two of the exam, allowing her double time to take the multiple-choice sections, among other accommodations.[3]  *Id.*  Plaintiff passed the first two components of the exam. ECF 36-2, at 95.

Plaintiff applied for accommodations on the third part of the exam, the CSE, in the second half of 2020, using the same process by which she had applied for accommodations on the other components. *See* ECF 45-23, at 140–41. In requesting these accommodations, she wrote "see evaluation" in response to questions asking her to identify and describe the accommodations she was seeking. ECF 36-17, at 2–3. After again consulting with Dr. Bugbee, Mr. Present denied almost every accommodation Plaintiff requested for part three, explaining that:

> Part III differs from Parts I and II in that time is considered to be an integral component for Part III. As such, it is very rare that we offer extra time for any station on the Part III exam. Also, the Part III exam has built-in breaks between stations that do not exist for the Part I and Part II exams. And reading is not a component of the Part III exam as it is for Parts I and II.

ECF 36-19, at 2; *see also* ECF 36-5, at 5–6. The only accommodation Plaintiff was allowed on the CSE was a choice of either extra break time between the stations of the CSE or a rearrangement of the stations of the CSE. ECF 36-19, at 2. Plaintiff attempted the CSE three times since the accommodations decision, and she has failed each time. ECF 36-2, at 95 (showing Plaintiff's scores for each test attempt).

A.    The expert opinions currently before the Court

After the close of discovery, Defendant moved for summary judgment. ECF 36. The pending motions to strike, ECFs 43, 51, and 52, and Plaintiff's cross motion for summary

---

[3] In addition to receiving double time, Plaintiff was able to take her exams over two days and be in a separate room for testing. ECF 36-9, at 2.

judgment, ECF 45, followed thereafter.  Plaintiff asks this Court to strike the report and testimony

of Dr. David Damari, who has been identified as an expert by Defendant.  ECF 43.  According to

Plaintiff, Dr. Damari is not qualified as an expert with respect to the topics on which he intends to

opine, he fails to explain the basis of his opinions, and his opinions will not be useful to the trier

of fact.  ECF 43-1, at 4–5.

Defendant asks that the report and testimony of Plaintiff's purported expert, Mr. Jaime

Axelrod, be stricken for the same reasons, in addition to the fact that Mr. Axelrod "did not follow

his own proscribed methodology" in evaluating Plaintiff's case.  ECF 52, at 1–4.  Defendant also

moves to strike the evaluations of Plaintiff's disabilities completed by Dr. Wolff, Dr. Scott

Greenaway, and Dr. Scott Duncan, on the basis that Plaintiff did not properly identify the doctors

as expert witnesses and because the doctors have inadequate knowledge of the CSE such that they

cannot opine on Plaintiff's accommodations required for that exam.  ECF 51, at 1–5.

### 1.     Dr. Damari's experience and qualifications

Dr. Damari is an optometrist and a long-time professor of optometry who currently serves

as a clinical professor at the Ohio State University College of Optometry.  ECF 43-9, at 7; ECF

49-2, at 7.   He has done substantial work in the area of vision-based disability and

accommodations, including publishing on the topic and serving as a "[c]onsultant to various testing

organizations on compliance with ADA and ADA Amendments Act since 1995."  ECF 43-9, at 7;

ECF 49-2, at 7; *see also* ECF 49-3, at 7, 12:6–22 (explaining that Dr. Damari's ADA consulting

work relates solely to accommodations for visual disabilities).  He describes himself as "an expert

in the area of visual disabilities" and, in that role, advises on "the accommodation or set of

accommodations that would best ensure that [visually] disabled candidates [can] have equal access

to the test material."  ECF 43-10, at 6, 15:15–19.  Dr. Damari's expertise on ADHD and other

learning disorders is limited to the training he received during his residency, working with a "wide

range of patients" in his optometry practice—including "patients who have suffered brain injuries," "patients with developmental disabilities," and "[p]atients on the autistic spectrum"— and attendance at "an annual meeting that the National Board of Medical Examiners has for all their consultants that includes experts in learning disabilities and ADHD" with whom he has "conversations" and "discussions." ECF 49-3, at 5–6, 9:19–10:5 (discussing working with patients with cognitive issues); *id.* at 8, 19:13–17 (discussing attendance at the annual meeting); *id.* at 10, 21:19–22 (describing residency training); *id.* at 11, 31:12–22 (discussing his conversations with ADHD experts at the annual conferences).

In 2002, Dr. Damari consulted with Defendant on "develop[ing] a new policy for better compliance with the Americans with Disabilities Act." ECF 43-10, at 6, 13:10–12. The entirety of Dr. Damari's work with Defendant occurred during "a very brief time" over a 13-week sabbatical. ECF 43-10, at 6, 13:6–14:20. The policy he helped to develop "involved . . . better documentation about what the guidelines should be for a disabled individual who wanted to apply for accommodations." *Id.* at 13:20–22. He "ha[s] no way of knowing if [Defendant] still use[s] the same policy that [he] consulted on back in 2002." *Id.* at 13:14–16. Dr. Damari makes no mention of consulting with or working with Defendant in any other capacity until he was asked to opine on this case. *See id.* at 13:1–15:3 (explaining his work during 2002 and that he was asked to opine on Plaintiff's case but making no mention of any other work with Defendant).

### 2. Mr. Axelrod's experience and qualifications

Mr. Axelrod is the Director of Disability Resources and ADA/504 compliance officer at Northern Arizona University. ECF 52-2, at 1. Prior to his work in higher education, he was a mental health therapist. *Id.* He has done significant work in the realm of disability accommodations in higher education, serving on several committees and boards on the topic. *Id.* He is "a frequent speaker and consultant on topics related to disability access in higher education,

6

having expertise in application of disability law in the post-secondary education context, policy, fundamental alteration determination process requirements, and the reasonable accommodation process," and has contributed to recently published work relating to postsecondary disability accommodations. *Id.* Mr. Axelrod routinely reviews student medical documentation relating to their disabilities and recommends corresponding accommodations for their college courses and exams. ECF 57-11, at 191–192, 13:18–15:15; *id.* at 193, 19:15–21:9. Mr. Axelrod is not an optometrist, nor does he have any particular expertise in or knowledge of optometry education or the NBEO exam beyond the publicly available information he reviewed as part of his consulting on this case. ECF 52-3, at 13–15, 33:5–35:13.

3. <u>The reports of Dr. Wolff, Dr. Greenaway, and Dr. Duncan</u>

Dr. Wolff is a licensed clinical psychologist who examined Plaintiff and wrote a report regarding her disabilities and the accommodations she requires in academic and testing contexts in 2017. ECF 36-6, at 2–40. In his report, Dr. Wolff makes reference to and relies on previous evaluations completed by Drs. Duncan and Greenaway in 2013 and 2008, respectively. ECF 36-6, at 3 (identifying the reports by Drs. Duncan and Greenaway as sources reviewed as part of Dr. Wolff's evaluation of Plaintiff).

Plaintiff submitted the 2017 evaluation from Dr. Wolff to Defendants as support for her requests for accommodations on the NBEO exam. *See* ECF 36-5, at 2–3 (identifying Dr. Wolff's report as being attached to Plaintiff's accommodation request). Dr. Wolff's report is provided as an exhibit by both Defendant and Plaintiff. *See* ECF 36-6, at 2–40; ECF 45-23, at 145–183. No additional report, declaration, or deposition has been provided on behalf of Dr. Wolff by either party. Plaintiff has also provided the reports of Dr. Duncan and Dr. Greenaway. ECF 45-5, at 2–7 (showing Dr. Duncan's report); ECF 45-4, at 2–11 (showing Dr. Greenaway's report). Though Plaintiff identified all three of these providers as fact witnesses, she did not identify any of them

7

as expert witnesses. *See* ECF 51-9, at 1–4 (showing that Plaintiff did not identify any of these providers as expert witnesses under Rule 26(a)(2)); ECF 51-10, at 1–3 (showing that Plaintiff identified these providers as fact witnesses under Rule 26(a)(1)).

## II.    **LEGAL STANDARDS**

Federal Rule of Evidence 702 provides that an expert who is qualified "by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if "the expert is proposing to testify to (1) scientific [or otherwise specialized] knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). The proponent of the expert bears the burden to demonstrate that their witness is qualified to testify as an expert. Fed. R. Evid. 702.

"A district court considering the admissibility of expert testimony exercises a gate keeping function to assess whether the proffered evidence is sufficiently reliable and relevant." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citation omitted). The reliability "inquiry should be a 'flexible one,' and should focus on the 'principles and methodology' employed and not the conclusions reached." *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 296 (4th Cir. 1998) (quoting *Daubert*, 509 U.S. at 594–95). In order for an opinion to be reliable, it must be "based on sufficient facts or data," "the product of reliable principles and methods," and "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702 (b)–(d). Furthermore, "the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Westberry*, 178 F.3d at 261 (citing *Cavallo v. Star Enter.*, 100 F.3d 1150, 1158–59 (4th Cir. 1996)).

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether

the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.    ANALYSIS OF EXPERT MOTIONS

The Court addresses each motion to strike expert testimony in turn. Plaintiff's motion to strike Dr. Damari's testimony, ECF 43, will be granted in part and denied in part. Defendant's motion to strike Mr. Axelrod's report and testimony, ECF 52, will be granted in part and denied in part. Defendant's motion to strike the reports of Dr. Wolff, Dr. Greenaway, and Dr. Duncan, ECF 51, will be denied.

### A.    Plaintiff's motion to strike Dr. Damari's report will be granted in part and denied in part.

Dr. Damari has provided seven statements of opinion on this case, all of which Plaintiff objects to. *See* ECF 49-1, at 2–4 (showing Dr. Damari's opinions); ECF 43-1, at 7–9 (listing and opposing Dr. Damari's opinions). In particular, Dr. Damari has opined to the following:

1. The NBEO's Part III Clinical Skills Examination (CSE, or Part III) does not require a significant amount of reading or computation.
2. [Plaintiff's] limitations as identified by Dr. Wolff in his report were not implicated on the CSE because there is not a significant amount of reading or computation required, and materials were available prior to the examination.
3. [Plaintiff] did not provide sufficient documentation supporting her request for extra time on the CSE.
4. Double time on the CSE would have fundamentally altered the examination because the timed aspect of the examination is a major indication of what is expected of a practicing optometrist.
5. Double time on certain aspects of CSE could present a risk to the safety of the standardized patients.

6. [Plaintiff] demonstrably failed her attempts at the CSE due to poor technique, not due to time constraints.

7. [Plaintiff] is not "otherwise qualified" as an optometrist because her performance on the CSE and aspects of her evaluation by Dr. Wolff demonstrate that she does not have some core characteristics necessary for the practice of optometry.

ECF 43-9, at 3–4; ECF 49-2, at 3–4.

Dr. Damari is an optometrist; this much is undisputed. *See* ECF 43-10, at 4, 7:9–8:8 (explaining Dr. Damari's educational history); *id.* at 5, 9:5–10:15 (explaining Dr. Damari's work history as a professor of optometry). As such, he is certainly qualified to opine on topics pertaining to the field of optometry. *See United States v. Moss*, 544 F.2d 954, 961 (8th Cir. 1976) (affirming district court's decision to permit optometrist to testify as expert witness as to visual acuity). Undeniably, opinion five—that patient safety could be at risk from expanding the time provided to complete an optometry examination—is one that falls squarely into the realm of medical expertise Dr. Damari holds. Dr. Damari explained that this opinion is based on his professional experience, an evaluation of the particular skills involved in the CSE, and the medical consequences of extending the time for each task. ECF 43-9, at 3 (explaining Dr. Damari's conclusion). Undoubtedly, such an opinion is useful to the trier of fact in determining whether the granting of Plaintiff's requested accommodations would pose a "undue burden" or "direct threat" to Defendant. *See* 28 C.F.R. § 36.309(b)(3) (providing that a private entity that administers a professional exam must provide reasonable accommodations unless the accommodations would "fundamentally alter" the exam's purpose or pose an "undue burden"); *id.* § 36.208(a) (providing that accommodation need not be made when the individual seeking the accommodation poses a "direct threat to the health or safety of others"). As such, opinion five is admissible.

Dr. Damari's qualifications with regard to the remaining opinions, however, are not so clear cut. The Court finds it determinative that Dr. Damari, despite his experience in ADA

accommodations, has only ever advised on accommodations for students with visual disabilities, a niche that makes sense given his medical expertise. *See* ECF 49-3, at 7, 12:6–22. It is evident, however, that Dr. Damari is not an expert in ADHD or other learning disabilities. Cursory annual professional development, treating the vision of patients who happen to also have some of these conditions, and long-ago non-specialty training in residency on neuropsychology do not amount to expertise in testing accommodations for an individual with ADHD and learning disabilities. *See* ECF 49-3, at 5–6, 9:19–10:5 (discussing working with patients with cognitive issues); *id.* at 8, 19:13–17 (discussing attendance at annual meeting); *id.* at 10, 21:19–22 (describing residency training); *id.* at 11, 31:12–22 (discussing his conversations with ADHD experts at the annual conferences); *see also Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 198–99 (4th Cir. 2013) (finding that witness had "no scientific or technical knowledge that qualifies him to offer expert testimony in this case" where witness was a toxicologist, but had "no expert training with regard to the toxicity of" the type of chemicals at issue in the case). As such, opinions three and six—both of which relate directly to Plaintiff's ADHD and learning disabilities and the way they were accommodated, or not accommodated, on the exam—are not within Dr. Damari's realm of expertise as an optometrist and visual disability expert. Consequently, these opinions will not be admitted.

Defendant has also not carried its burden of showing that Dr. Damari is an expert on the NBEO exam as a whole or on the CSE on its own. *See* Fed. R. Evid. 702. Indeed, while Dr. Damari helped to develop Defendant's accommodations application protocol more than twenty years ago, he had no hand in developing or reviewing the exam itself, and he does not even know if his work is still in use. ECF 43-10, at 6, 13:14–16 (explaining that Dr. Damari "ha[s] no way of knowing if [Defendant] still use[s] the same policy that [he] consulted on back in 2002."). The

only experience Dr. Damari seems to have with the exam in the past two decades is reviewing Plaintiff's exam performance for this litigation. *See id.* at 13:1–15:3 (explaining Dr. Damari's work during 2002 and his work on Plaintiff's case, but making no mention of any other work with Defendant). Thus, while Dr. Damari may understand the skills needed to be an optometrist, he is no more qualified than any other person who has read the exam materials and reviewed a single candidate's performance to opine on the fundamental nature of the test, as he does in opinion four. Thus, opinion four will not be admitted.

Whether an expert is qualified is just one prong of this analysis; the opinions must also be helpful to the trier of fact. *Daubert*, 509 U.S. at 591 ("Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."). This means that the opinions must not only be relevant, but they must also illuminate one of the disputed issues in the case beyond what would be immediately apparent to a lay juror. *See United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013) ("The helpfulness requirement of Rule 702 thus prohibits the use of expert testimony related to matters which are "obviously . . . within the common knowledge of jurors." (quoting *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986))). Admission of expert testimony that merely "concerns matters within the everyday knowledge and experience of a lay juror" is "usually harmless," but can become prejudicial "when the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (citation omitted). This premise resolves the question of admissibility concerning Dr. Damari's remaining opinions.

As Dr. Damari is not uniquely qualified to opine on the CSE, his opinion on how much reading and math is involved in the CSE is based solely on his review of exam materials and Plaintiff's performance. *See* ECF 43-9, at 2 (describing the tasks of the CSE as a layperson would

understand them and summarily concluding that only minimal math and reading is required). As the filings for both Plaintiff and Defendant illustrate, the reading and math required on the exam can be readily explained directly to the factfinder without further supplementation. *See* ECF 43-1, at 11 ("Dr. Damari's report, and indeed all non-expert testimony and evidence in this case, indicates that, at minimum, the CSE includes a written case history, labels on bottles, and numbers off instruments and adding and subtracting two numbers at several points."); ECF 49, at 9–11 (explaining in-depth the reading and math that candidates must perform on the CSE). There is nothing to suggest that Dr. Damari's opinion that this amount of reading and math is not "significant" is the result of specialized knowledge; rather, it seems to be his lay assessment of the information that could be presented directly to the jury. *See* ECF 43-10, at 11, 35:14–17 (explaining that Dr. Damari formed his opinion about the amount of math and reading required on the CSE after he "reviewed the candidate guide, [he] reviewed what specific skills are asked of the candidate through all the stations, and [he] made that determination based on those reviews"). This is not a case in which such testimony would be harmless, however; this fact is very much in dispute, and Dr. Damari's opinion could easily "supplant a jury's independent exercise of common sense." *Kopf*, 993 F.2d at 377 (quoting *Scott*, 789 F.2d at 1055). As such, opinion one and opinion two, which is based on opinion one, do not help the trier of fact.

Finally, opinion seven is unhelpful to the trier of fact because there is no requirement that a candidate be "otherwise qualified" as an optometrist in order to receive accommodations required to compete on equal footing on the licensing exam, as explained below. As such, opinion seven cannot be helpful to the trier of fact because it has no bearing on this case. Only Dr. Damari's fifth opinion, relating to the safety of the patients, will be accepted. Plaintiff's motion to strike Dr. Damari's expert designation and testimony is granted in part and denied in part.

**B.      Defendant's motion to strike Mr. Axelrod's report will be granted in part and denied in part.**

Mr. Axelrod has provided four purported expert opinions, all of which Defendant objects

to. ECF 52, at 1–3. In particular, Mr. Axelrod has opined that:

> [1] [E]xtra time is necessary to best ensure that [Plaintiff] has an appropriate opportunity to demonstrate her true aptitude and achievement. . . .
> [2] [T]he provision of extra time is logically connected to the impacts of [Plaintiff's] disability. . . .
> [3] [T]he proposed accommodation of extra time is logically designed to best ensure that [Plaintiff] has an appropriate opportunity to demonstrate her true aptitude and achievement on the part three exam. . . .
> [4] [N]either choice of alternative accommodations offered by NBEO were sufficient to best ensure that [Plaintiff] has an appropriate opportunity to demonstrate her true aptitude and achievement on the part three exam.

ECF 52-2, at 3–5.

Mr. Axelrod is not a doctor nor a practicing medical professional of any kind. *See* ECF

52-2, at 1 (explaining Mr. Axelrod's qualifications); ECF 57-11, at 191, 12:1–13:6 (explaining

that Mr. Axelrod allowed his mental health therapist license to lapse after he started working in

higher education). He is an academic administrator with specialized knowledge in the field of

disability accommodations. ECF 52-2, at 1. He is not currently qualified to diagnose medical

conditions; instead, his expertise lies in reviewing medical evaluations from providers, including

their recommended accommodations, and approving or denying, in full or in part, requested

accommodations. ECF 57-11, at 191, 12:9–10 ("I'm not qualified to diagnose impairments any

longer."); *id.* at 193, 19:15–21:9 (explaining Mr. Axelrod's experience in approving disability

accommodations).

Even if this Court was satisfied that Mr. Axelrod is qualified to offer his first three opinions,

those opinions would not be helpful to a trier of fact. These opinions relate directly to Plaintiff's

underlying learning disabilities and her needs as a result of those disabilities, and they mirror

exactly Dr. Wolff's report on that subject. *Compare* ECF 57-5, at 85–87 (Dr. Wolff's

15

recommended accommodations), *with* ECF 52-2, at 3–7 (Mr. Axelrod's expert report).  Though Mr. Axelrod may have experience in devising accommodations based on a student's specific disabilities, he acknowledges that this skill flows from his expertise in assessing a doctor's evaluation of the same.   ECF 57-11, at 191–192, 13:18–15:15 ("Q: And so in making the determination of whether somebody qualifies as an individual with a disability, you're relying on information that you received from some other qualified professional? A: Yes.").   Here, Mr. Axelrod offers no opinion on the sufficiency, value, or connection between Dr. Wolff's report and Plaintiff's accommodations.  Instead, he largely adopts Dr. Wolff's recommendations as his own opinions. *See Zellers,* 533 F. App'x at 199 (finding no error when district court excluded purported expert testimony from a witness who "did not arrive at his own medical opinion.  Instead, he based his opinion on [another expert's] initial report.").   This adds no additional analysis beyond that present in Dr. Wolff's report and Mr. Axelrod is not qualified to independently offer such a medical opinion.  As such, Mr. Axelrod's first three opinions will not be permitted as expert testimony.

Opinion four, however, is of a different nature than the first three opinions.  The fourth opinion applies the suggestions offered by Dr. Wolff to the unique situation posed by Defendant's offering Plaintiff only extra breaks during the CSE.   Based on Mr. Axelrod's experience in providing accommodations based on medical evaluations, he concluded that solely offering extended breaks is not sufficient to accommodate Plaintiff's disabilities as described in her medical reports.  ECF 52-2, at 5–6.  Applying medical reports to classroom or exam accommodations is exactly within Mr. Axelrod's realm of expertise, regardless of the subject matter of the exam itself. *See* ECF 57-11, at 193–94, 20:2–22:4 (explaining that Mr. Axelrod has evaluated accommodations for various health-sciences related programs and exams).  Furthermore, this is helpful to the trier

16

of fact, in that it adds something beyond Dr. Wolff's report and helps to narrow the scope of what might be an appropriate response to Plaintiff's requests.

Though Defendant argues strenuously that Mr. Axelrod "did not follow his own prescribed methodology" because he did not evaluate Plaintiff's needs on the CSE on a "task-by-task basis," ECF 52-1, at 29 (capitalization adjusted), Mr. Axelrod's deposition reveals that he did indeed consider each of the independent tasks that comprise the CSE. Mr. Axelrod explained that he reviewed "information related to the different stations and the different skills and activities related to each one of those stations." ECF 57-11, at 197, 35:1–4. He took notes on the specific tasks and skills involved at each station, noting, for instance, that station one involved reviewing "[p]atient case history form, medical records" and would require the student to "[w]rite answer on the sheet" and complete a "[l]ens optometry form." *Id.* at 198, 39:2–5; *see also id.* at 39:11–19 (describing additional specific tasks required as part of station one); *id.* at 39:20–40:1 (describing tasks involved in station three, such as reading a sentence that the patient must read); *id.* at 40:2–9 (explaining tasks involved with station two, such as reading a chart, distinguishing between different types of contact lenses and solutions); *id.* at 199, 43:16–44:19 (explaining tasks involved in station four, such as "flip[ping]" a percentage). Therefore, the Court is satisfied that Mr. Axelrod completed a task-by-task analysis of the CSE and Plaintiff's required accommodations relating to those tasks. Mr. Axelrod's fourth opinion is admissible. Defendant's motion to strike Mr. Axelrod's report and testimony is granted in part and denied in part.

### C.     Defendant's motion to strike the reports of Dr. Wolff, Dr. Greenaway, and Dr. Duncan will be denied.

Defendant moves to strike the reports of Dr. Wolff, Dr. Greenaway, and Dr. Duncan in their entirety because Plaintiff failed to identify any of these doctors as expert witnesses or produce expert reports by the deadline set by this Court. ECF 51, at 1. But Defendant provides no authority

to support the argument that a medical record produced well before litigation and attainable through fact discovery is considered expert testimony. *See* ECF 51-1, at 1–7 (treating the reports as testimony without explaining why they should be considered as such). "Testimony" is defined as "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition." *Testimony*, Black's Law Dictionary (11th ed. 2019). It is difficult to see how any of these reports, prepared by medical professionals in a medical context wholly independent from this, or any, lawsuit, could be considered testimony of any kind.[4] As such, the motion to exclude the reports of Dr. Wolff, Dr. Greenaway, and Dr. Duncan is denied.

## IV.   ANALYSIS OF SUMMARY JUDGMENT MOTIONS

The Court now turns to the parties' motions for summary judgment. Defendant claims that it is entitled to summary judgment because (1) Plaintiff's claim is moot; (2) the Court must defer to Defendant's judgment regarding testing accommodations; (3) Plaintiff would not have passed the exam even with the accommodations and therefore is not qualified to be an optometrist; and (4) the accommodations requested by Plaintiff would have fundamentally altered the CSE and posed a direct threat to patient safety. ECF 36, at 2–3; ECF 36-1, at 8–9. Plaintiff counters that she is entitled to summary judgment because (1) Defendant violated her rights under the ADA; (2) the case is not moot; and (3) Defendant has failed to prove that her requested modifications would pose an undue burden, a direct threat, or require a fundamental alteration to the exam. ECF 45, at 1–2. Because the Court determines that there are genuine disputes of material fact with respect to

---

[4] Furthermore, Dr. Wolff's report was provided not only by Plaintiff as an exhibit, but also by Defendant as an attachment to its own motion for summary judgment. *See* ECF 36-6, at 2–40. As such, the authenticity and admissibility of Dr. Wolff's report cannot fairly be disputed by Defendant. *See Castro-Medina v. Procter & Gamble Com. Co.*, 565 F. Supp. 2d 343, 360 n.3 (D.P.R. 2008) (denying motion to strike expert report for failing to follow proper discovery procedures when the substance of the report was uncontested).

18

the reasonableness of Plaintiff's requested accommodations, both motions for summary judgment will be denied.

The ADA requires that any entity "that offers examinations . . . related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. In particular, "[a]ny private entity offering [such] an examination . . . must assure that . . . [t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability . . . the examination results accurately reflect the individual's aptitude or achievement level . . . rather than reflecting the individual's [disability]." 28 C.F.R. § 36.309(1)(i).

The parties dispute which standard to apply to Plaintiff's claim. While Plaintiff cites to the general standard for a violation of Title III of the ADA, Defendant proposes a modified version of a narrower standard applied specifically in the context of higher education. *Compare* ECF 45-1, at 26 ("To prevail under Title III of the ADA, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against him because of his disability." (quoting *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669–70 (4th Cir. 2019))), *with* ECF 36-1, at 23 ("To prevail under Title III of the ADA, Halig must show that she: (1) is disabled; (2) was qualified to meet the licensing requirements to become a practicing Optometrist; and (3) requested a reasonable accommodation that would not fundamentally alter the nature of and purpose of NBEO's Part III Clinical Skills Examination." (citing *Hoppe v. Coll. of Notre Dame of Md.*, 835 F. Supp. 2d 26, 32 (D. Md. 2011))).

19

The Court agrees that the higher education-specific failure-to-accommodate standard applies in this case but declines to adopt Defendant's interpretation of what it means to be "otherwise qualified," as explained more in depth below. As such, to prove her claim, Plaintiff must show that she "(1) is disabled; (2) is 'otherwise qualified' academically; and (3) requested a reasonable accommodation that would not fundamentally alter the nature of the defendant's service."[5] *Hoppe*, 835 F. Supp. 2d at 32 (citing *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006)). The Court will address each of these elements in turn, but first, the jurisdictional question of mootness must be answered.

### A.    Plaintiff's claims are not moot.

Defendant asserts that this case is moot because Defendant is redesigning part three of the NBEO exam, such that the CSE will no longer be offered. ECF 36-1, at 24–25 (citing ECF 36-2, at 6). Because of this redesign, Defendant argues, the Court is unable to order any relief for Plaintiff with respect to accommodations on the CSE. *Id.* Though Defendant has not provided many details about the redesigned exam, it is clear that the new part three will still test clinical skills with standardized patients by having candidates complete optometry tasks. ECF 36-2, at 7 (stating that "optometric skills are part of the [new] Part III" exam). The new part three will still be timed. *See* ECF 36-2, at 98 (linking to "PEPS Information Video" which shows at 08:39 a graphic noting that the new part three exam will be timed).

---

[5] Some framings of this inquiry treat the absence of a fundamental modification is a component of reasonableness instead of a separate requirement. *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (explaining that an accommodation that requires a "fundamental alteration" is necessarily unreasonable). Because the parties treat a fundamental modification as an inquiry separate from that of reasonableness, however, the Court will do the same. *See* ECF 45-1, at 36 (asserting that a showing of a "fundamental alteration" is an affirmative defense); ECF 36-1, at 23 (listing a requirement that an accommodation not require a fundamental alteration as a component of an element of the claim).

"The doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction, which extends only to actual cases or controversies." *Fleet Feet, Inc., v. Nike, Inc.,* 986 F.3d 458, 463 (4th Cir. 2021) (quoting *Porter v. Clarke,* 852 F.3d 358, 363 (4th Cir. 2017)). "This case-or-controversy requirement subsists through all stages of federal judicial proceedings . . . . The parties must continue to have a 'personal stake in the outcome' of the lawsuit." *Spencer v. Kemna,* 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477–78 (1990)). This means that, throughout the litigation, a plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id.* (quoting *Lewis,* 494 U.S. at 477). "If intervening factual or legal events effectively dispel the case or controversy during pendency of the suit, the federal courts are powerless to decide the questions presented." *Ross v. Reed,* 719 F.2d. 689, 693–94 (4th Cir. 1983). A case no longer presents an actionable controversy and thus "becomes moot only when it is impossible for a court to grant any effectual relief whatever to a prevailing party." *Chafin v. Chafin,* 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps. Int'l. Union,* 567 U.S. 298, 307 (2012)).

However, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 (1982)). "Pursuant to the 'voluntary cessation' exception, a civil action does not become moot when a defendant voluntarily ceases its allegedly improper behavior, if there is a reasonable chance that the behavior will resume." *Lighthouse Fellowship Church v. Northam,* 20 F.4th 157, 162 (4th Cir. 2021). Though not

impossible, "it is not easy to make a sufficient showing that the voluntary cessation exception does not apply." *Id.*

Here, the illegal conduct of which Plaintiff complains is the denial of her requested accommodations on the timed, clinical portion of the NBEO examination. ECF 1, at 1. Though Defendant is changing the details of part three of the exam, the core elements of part three for the purposes of this claim remain: it will be a practical, clinical component, and it will be timed. While Defendant has ceased, for the moment, to actively deny Plaintiff the accommodations she seeks as it transitions to the new exam, this does not indicate that that it will not again deny her accommodations on the same basis for the new exam. Indeed, given that the new version part three will still be a timed clinical component, it seems entirely likely that "there is a reasonable chance that the behavior will resume." *Lighthouse Fellowship Church*, 20 F.4th at 162. As such, Plaintiff's claims are not moot.

The Court now turns to an analysis of the merits of the claims.

## B.     Plaintiff is disabled under the ADA.

The first element of a successful failure-to-accommodate claim under the ADA is that the plaintiff be disabled under the ADA. *Hoppe*, 835 F. Supp. 2d at 32. A person is disabled under the ADA if they have "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). "Determining whether a specific accommodation is reasonable requires an individualized inquiry into the circumstances of the particular case." *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 654 (E.D. Pa. 2013) (citation omitted), *aff'd*, 582 F. App'x 114 (3d Cir. 2014). Though Defendant argues in its opposition to Plaintiff's cross-motion for summary judgment that "whether [Plaintiff] has a qualifying disability [is and] will be a contested and disputed issue," ECF 50, at 13, the Court is satisfied that Plaintiff has demonstrated that she is disabled within the meaning of the ADA.

ADHD and other learning disabilities can be, but are not always, qualifying disabilities under the ADA. *Compare Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 484 (D. Md. 2015) (finding that the plaintiff had adequately alleged a disability when he "alleged 'a physical or mental impairment' (ADHD) that 'substantially limits' (by requiring medication that prevents him from working under certain recurring circumstances . . .) a 'major life activit[y]' (work)"), *with Rudolph v. Buncombe Cnty. Gov't*, 846 F. Supp. 2d 461, 471–72 (W.D.N.C.) (finding that the plaintiff was not disabled under the ADA when her ADHD was managed with medications and did not substantially impact any major life activities), *aff'd*, 474 F. App'x 931 (4th Cir. 2012). Whether a learning impairment renders one disabled under the ADA depends on whether the impairment "restrict[s] the ability to perform a major life activity in comparison to other persons." *Rudolph*, 846 F. Supp 2d at 471. "Major life activities include '. . . learning, reading, concentrating, thinking, communicating, and working.'" *Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 875 (4th Cir. 2020) (citing 42 U.S.C. § 12102(2)(A)).

Here, it is clear that Plaintiff's conditions substantially limit her ability to think, concentrate, and learn. Dr. Wolff's evaluation notes that Plaintiff "has a difficult time focusing in classes, is easily distracted, and needs more time to complete coursework than her peers" and that the symptoms Plaintiff experiences have "caused significant academic problems resulting in poor grades, and a prior academic dismissal from a doctoral program at the Illinois College of Optometry." ECF 36-6, at 23. Defendant does not dispute that Plaintiff was expelled from the Illinois College of Optometry for poor academic performance, and that her performance improved once she was readmitted and given her requested accommodations. ECF 36-1, at 11. In fact, Defendant itself found that Plaintiff's disabilities impacted her ability to concentrate enough to merit accommodations in the other sections of the NBEO exam. *See* ECF 36-4, at 13, 44:10–12

("I was addressing the issue of ADHD and attention span by providing time for refresh and refocus for [Plaintiff]."). As such, it is clear that Plaintiff's conditions substantially impact one or more major life activities, and she is disabled under the meaning of the ADA.

C.   **Plaintiff is "otherwise qualified" to take the CSE.**

Defendant asserts that the "otherwise qualified" element of Plaintiff's claim requires that she demonstrate that she was qualified to be an optometrist, other than her failure to pass the CSE. *See Hoppe*, 835 F. Supp. 2d at 32. Plaintiff disagrees and argues that any "otherwise qualified" element only requires that Plaintiff show she was qualified to *take* the CSE. ECF 56, at 15–16. Plaintiff is correct.

"Although Title III of the ADA does not expressly include the Rehabilitation Act's 'otherwise qualified' standard, courts analyze Title III claims against educational institutions under that standard." *Hoppe*, 835 F. Supp. 2d at 32. "A 'qualified' individual is one 'who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements' for participation in a program or activity." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012) (citing *Constantine v. Rectors, Visitors George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).

Here, the activity for which Plaintiff seeks accommodations is not becoming a practicing optometrist, as Defendant's argument implies; rather, Plaintiff seeks only to take the CSE with her requested accommodations. ECF 1, at 14–15. Thus, the relevant "program or activity" for which Plaintiff must "meet[] the essential eligibility requirements" is sitting for the exam itself, not the practice of optometry. *Halpern*, 669 F.3d at 462. As Plaintiff aptly explained, "Title III does not condition a testing entity's obligation on whether a candidate will pass." ECF 56, at 15. There is no dispute that Plaintiff is qualified to take the CSE; indeed, Defendant has let her attempt it

multiple times already. *See* ECF 36-2, at 95 (showing that Plaintiff has taken the CSE three times). As such, Plaintiff is otherwise qualified under the ADA.

The Court now addresses the questions of whether Plaintiff's requested accommodations were "reasonable" and whether they required a "fundamental alteration" to the CSE.

### D. Disputes of fact about the reasonableness of Plaintiff's requested accommodations preclude summary judgment.

The final element of a failure to accommodate claim under Title III of the ADA requires that Plaintiff demonstrate that her requested accommodation is reasonable. *J.D. by Doherty*, 925 F.3d at 671. Once she has done so, the burden then shifts to Defendant to show that the requested accommodation would require a fundamental alteration of its program. *Id.* Because genuine disputes of material facts underlie the analysis of whether Plaintiff's requested accommodation is reasonable, summary judgment cannot be granted, and the Court need not reach the question of whether the accommodation requires a fundamental alteration of the CSE.

### 1. Defendant is not entitled to deference on its decision to deny Plaintiff's requested accommodations.

First it is worth addressing Defendant's contention that the Court must defer to its consideration of reasonableness. ECF 36-1, at 25–26. "Courts 'ordinarily' defer to the 'professional, academic judgments of educational institutions[.]'" *Bahl v. New York Coll. of Osteopathic Med. of New York Inst. of Tech.*, 683 F. Supp. 3d 224, 236 (E.D.N.Y. 2023) (quoting *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 191 (2d Cir. 2015)). Some courts have found that testing entities are entitled to this deference as well as more traditional academic institutions. *See Rawdin*, 985 F. Supp. 2d at 654–55 ("[The defendant] is an academic institution in that it awards a credential based on testing and evaluation of candidates, and just as educational institutions are granted deference regarding accommodations that would devalue an academic degree, so too should [the defendant] be granted deference regarding accommodations

25

that would devalue certification."). "Nevertheless, judicial deference to the academic decisions is not absolute, as deference only attaches to decisions evincing some amount of reasoned consideration or professional judgment." *Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1233 (S.D. Fla. 2010). A court need not defer to an academic institution "where the record 'is devoid of evidence' showing that an institution evaluated a potential accommodation's effectiveness and potential for undue hardship or a substantial modification." *Bahl*, 683 F. Supp. 3d at 236 (citing *Dean*, 804 F.3d at 191). And if a decision on accommodations is "plainly not based on professional judgment," it is not entitled to deference. *Forbes*, 768 F. Supp. 2d at 1231.

Here, Mr. Present made the determination that Plaintiff was not entitled to all of her requested accommodations on the CSE, particularly extended time. ECF 36-5, at 5–6. In so doing, Mr. Present was operating under the understanding that time constraints were a fundamental component of the exam, and this appears to have been a primary motivating force in his decision. *See* ECF 36-19, at 2 (showing email from Mr. Present to Plaintiff explaining denial of extra time on CSE by stating in part "Part III differs from Parts I and II in that time is considered to be an integral component for Part III. As such, it is very rare that we offer extra time for any station on the Part III exam."). Yet despite this, Defendant granted extended time to other candidates both before and after Plaintiff's request for extended time, *see* ECF 36-4 at 19, 117:16–22, deeply undercutting the assertion that the timing of the exam could not be altered and suggesting that Defendant did not adequately undertake an evaluation of Plaintiff's "potential accommodation's effectiveness and potential for undue hardship or a substantial modification." *Bahl*, 683 F. Supp 3d, at 236.

Additionally, the expert with whom Mr. Present consulted regarding Plaintiff's accommodations on the CSE, Dr. Bugbee, appears to have had minimal knowledge of the CSE

beyond the brief summary of the exam provided by Mr. Present in an email, which included statements that "[t]here is no reading involved" in the CSE and that Defendant "consider[s] time to be an integral component" of the CSE with no explanation for either statement. *See* ECF 36-18, at 2–3 (showing Mr. Present's email to Dr. Bugbee); ECF 36-7, at 18, 27: 6–8 ("The information I have about what specifically [Plaintiff] was requesting would be based on [Mr. Present's] email."); *see also id.* at 16, 25:17–22 ("Q: And [the CSE is] a practical clinical skills exam; is that accurate? A: From my understanding, yes. Q: Before this, had he ever reached out to you about [the CSE]? A: I don't recall specifically."). But, as explained above, it has not been demonstrated that a request for extended time truly would have resulted in a fundamental alteration to the exam, and there is a dispute as to how much reading is involved in the CSE. As such, it is not clear that Dr. Bugbee based her recommendation that nearly all of Plaintiff's requested accommodations be denied on an accurate consideration of the effectiveness of the requested accommodations on the CSE specifically or that she considered whether those accommodations would pose an undue burden or fundamental alteration to the CSE. As such, the Court will not defer to Defendant's determinations regarding Plaintiff's accommodations.

2.      The question of whether the requested accommodations were reasonable is a fact-intensive one that is best left to the jury.

"Determination of the reasonableness of a proposed modification is generally fact-specific." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016) (citing *Halpern*, 669 F.3d at 464). "A modification is reasonable if it is 'reasonable on its face' or used 'ordinarily or in the run of cases' and will not cause 'undue hardship.'"[6] *Id.* at 507; *see also Krpan v. Registry*

---

[6] Some definitions of "reasonable" accommodations note that an accommodation that includes a "fundamental alteration" is per se unreasonable. *See Halpern*, 669 F.3d at 464. Because the Court is utilizing a definition of the elements of this claim that includes the question of fundamental alteration or undue burden as a separate sub-element, however, the definition of "reasonable" cannot also include the absence of such an alteration, lest the analysis turn circular and redundant.

*of Interpreters for the Deaf, Inc.*, 167 F. Supp. 3d 774, 791 (E.D. Va. 2016) ("An accommodation under the ADA causes an undue burden 'when it requires significant difficulties or expense when considered in light of a number of factors, including the type of service or product being offered.'" (quoting *Rawdin*, 985 F.Supp.2d at 656)). A reasonable accommodation must also be necessary. *J.D. by Doherty*, 925 F.3d at 671.

Whether Plaintiff's requested accommodation of extra time is reasonable requires consideration of several factors, and both parties have presented fact evidence to support their arguments sufficient to create a genuine dispute of material fact. *Rawdin*, 985 F. Supp. 2d at 654–55 ("Determining whether a specific accommodation is reasonable requires an individualized inquiry into the circumstances of the particular case." (citation omitted)). Plaintiff asserts that Dr. Wolff's report clearly indicates that Plaintiff needs extra time on the CSE because the CSE implicates several skills with which Plaintiff struggles due to her disability. ECF 45-1, at 27–28 (citing ECF 46-1, at 14–26). Defendant counters that the CSE involves minimal math and reading, two of Plaintiff's biggest areas of difficulty, and as such extended time is not necessary. ECF 36-1, at 27 (citing ECF 36-12, at 7–13). Plaintiff argues that the math and reading on the CSE is not as minimal as Defendant asserts. ECF 45-1, at 28–29 (citing ECF 36-12, at 7). Furthermore, Plaintiff points to the fact that extra time has been approved for other test-takers to support that providing such an accommodation is not an undue burden on Defendant. ECF 45-1, at 37; *see also* ECF 36-4 at 19, 117:16–22. But Defendant provides evidence that granting Plaintiff extra time would indeed pose significant administrative difficulties. *See* ECF 50, at 28 (citing ECF 50-19, at 2–3).

Such a "fact-intensive" determination "is best left to a jury, who can weigh the competing evidence and make credibility determinations." *J.D. by Doherty*, 925 F.3d at 675. Thus, there is

a genuine dispute of material fact as to the reasonableness of the requested accommodations. As this presents a dispute of material fact, it precludes summary judgment, and the Court need not reach the question of whether this accommodation requires a fundamental modification of the CSE or whether such an accommodation would pose a direct threat.

## V.    **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment, ECF 36, is **DENIED**; Plaintiff's motion for summary judgment, ECF 45, is **DENIED**; Plaintiff's motion to strike the expert testimony of Dr. Damari, ECF 43, is **GRANTED in part** and **DENIED in part**; Defendant's motion to strike the report and testimony of Mr. Axelrod, ECF 52, is **GRANTED in part** and **DENIED in part**; and Defendant's motion to strike the evaluations of Dr. Wolff, Dr. Greenaway, and Dr. Duncan, ECF 51, is **DENIED**.

A separate implementing Order will issue.

Dated: <u>July 1, 2024</u>                                    <u>          /s/          </u>
                                                            Brendan A. Hurson
                                                            United States District Judge