## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| LUMA HALIG, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 22-2118-BAH |
| NATIONAL BOARD OF EXAMINERS IN OPTOMETRY, INC., | * | |
| | *. | |
| Defendant. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OF DECISION

Plaintiff Luma Halig ("Plaintiff" or "Halig") brings suit against Defendant National Board of Examiners in Optometry, Inc., ("Defendant" or "NBEO") challenging the denial of testing accommodations requested by Halig on Part III of the NBEO optometry certification examination, also known as the Clinical Skills Examination ("CSE"). *See* ECF 1. Halig brings her claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. *See id.* She requests declaratory and permanent injunctive relief. *Id.* at 14–15. The parties proposed a joint pretrial order, ECF 79, and submitted joint stipulations of fact, ECF 102-1. The Court held a three-day bench trial, beginning on Monday, September 22, 2025, and concluding on Wednesday, September 24, 2025. After the trial, the parties submitted proposed findings of fact and conclusions of law. *See* ECF 122 (Defendant); ECF 123 (Plaintiff). This memorandum sets forth the Court's findings of fact and conclusions of law based upon the evidence and testimony presented at trial. For the reasons explained below, judgment will be entered in favor of the Defendant.

## I.    FINDINGS OF FACT

### A.    The CSE

NBEO is a non-governmental, non-profit corporation that administers entry-into-the-profession examinations for optometry. ECF 122, at 4 ¶ 10; ECF 123, at 3 ¶ 2. Passing certain NBEO-administered examinations is required to obtain a license from state optometry boards. ECF 122, at 4 ¶ 10; ECF 123, at 3 ¶¶ 2–3. At the time of the events giving rise to this case, the licensure examination consisted of three parts: Part I, the Applied Basic Science Examination; Part II, the Patient Assessment & Management Examination; and Part III, the Clinical Skills Examination.[1] ECF 102-1, at 2 ¶¶ 1–3; ECF 122, at 5 ¶ 12; ECF 123, at 3 ¶ 4. Parts I and II of the exam are computer-based multiple choice exams that can be taken at testing centers.[2] ECF 102-1, at 7 ¶ 38; ECF 122, at 5 ¶ 13; ECF 123, at 4 ¶ 7. The CSE, on the other hand, was a performance-based exam in which candidates were evaluated on a range of clinical skills performed on standardized, or mock, patients. ECF 102-1, at 7 ¶ 39; ECF 122, at 7–8 ¶¶ 27–31; ECF 123, at 4 ¶ 9.

The CSE was administered at NBEO's National Center of Clinical Testing in Optometry in Charlotte, North Carolina, where candidates were scored on their performance of standard optometric clinical skills, performed in testing facility exam rooms that simulated real-life optometric examination rooms. ECF 102-1, at 2 ¶ 7; ECF 122, at 8 ¶ 28; ECF 123, at 4 ¶ 8. The

---

[1] As of May of 2024, NBEO no longer administers the CSE. ECF 122, at 43 ¶ 185. Since August of 2024, NBEO administers a different exam, the Patient Encounters and Performance Skills ("PEPS") Examination, as Part III of the licensing exam for optometry. ECF 122, at 43 ¶ 186.

[2] Part I of the exam tests the underlying basic science concepts necessary to enter the clinical practice of optometry. ECF 102-1, at 2 ¶ 4; ECF 122, at 5 ¶ 14. Part II of the exam assesses candidates' clinical thinking and decision-making with an emphasis on diagnosis and treatment. ECF 102-1, at 2 ¶ 5; ECF 122, at 5 ¶ 15.

CSE took place over a single day and consisted of four stations and 19 skills, which are divided between the four stations. ECF 102-1, at 7 ¶ 40; ECF 122, at 9 ¶¶ 33–34; ECF 123, at 4 ¶ 10. Following registration but before beginning the CSE, candidates were typically provided with 30 minutes in an orientation room, during which time they could familiarize themselves with the equipment and supplies that would be in the exam rooms. ECF 122, at 12 ¶ 51. Additionally, prior to starting each station, candidates were given five minutes in the exam room associated with that station. ECF 123, at 5 ¶ 16; ECF 117, at 82:17–83:4, 219:25–9. There was a specific amount of time allotted for candidates to perform clinical skills at each of the four stations once the exam began. ECF 102-1, at 4 ¶ 21. At Stations 1, 2, and 3, candidates received 30 minutes. ECF 102-1, at 4 ¶ 21; ECF 122, at 10 ¶ 38; ECF 123, at 4 ¶ 11. At Station 4, candidates received 15 minutes. ECF 102-1, at 4 ¶ 21; ECF 122, at 10 ¶ 38; ECF 123, at 4 ¶ 11. Candidates also received a four- to five-minute break between each station. ECF 122, at 10 ¶ 39.

At each station, candidates encountered a standardized patient. ECF 102-1, at 7 ¶ 40; ECF 123, at 4 ¶ 10. An in-person examiner was present in Station 2, and a proctor was present in Station 4. ECF 102-1, at 8 ¶ 46; ECF 123, at 6 ¶ 23. Instructions for the station appeared on a laptop located in the examination room, although candidates were not required to read the instructions.[3] ECF 122, at 15 ¶ 56. The examiner in Station 2 and proctor in Station 4 were instructed to stop the candidate if the candidate's performance on a skill jeopardized the safety of the standardized patient. ECF 102-1, at 8 ¶ 47; ECF 123, at 6 ¶ 24. A candidate who was stopped in a CSE skill for safety reasons was scored as not having performed any remaining parts of the skill. ECF 102-

---

[3] The instructions present in the examination rooms were also available ahead of the exam on NBEO's website. ECF 122, at 14 ¶ 57; ECF 123, at 5 ¶ 17.

1, at 8 ¶ 48; Joint Ex. 32, at 13. The candidate's performance at each station was videotaped and reviewed by examiners who scored the candidate's performance. ECF 122, at 9 ¶ 37.

Examiners evaluated candidates on between 50 and 119 criteria per station. ECF 102-1, at 7 ¶ 42; ECF 122, at 9 ¶ 36; ECF 123, at 5 ¶ 15. Candidates were allowed to repeat specific skills up to four times within a station, with only their final performance counting toward their evaluation. ECF 102-1, at ¶ 43; ECF 123, at 5 ¶ 20. In some circumstances, NBEO provided CSE candidates with additional time for issues outside of the candidate's control, such as for equipment malfunction or standardized patient behavior. ECF 102-1, at 7 ¶ 44; ECF 123, at 5 ¶ 21. In such cases, the candidate was allowed to repeat the skill after the station ended. ECF 102-1, at 7 ¶ 44. Candidates who received any extended time on the CSE were evaluated and scored using the same criteria.[4] ECF 102-1, at 11 ¶ 71. NBEO had the ability to provide a candidate taking the CSE with a different standardized patient if they determined that a new patient was necessary to address any scheduling, fairness, or safety concerns. ECF 102-1, at 8 ¶ 45.

Prior to exam day, NBEO made preparation materials available to candidates on NBEO's website. ECF 102-1, at 5 ¶ 24; ECF 122, at 10–11 ¶¶ 41, 48; ECF 123, at 4 ¶ 14, at 5 ¶ 17. One such material, the Part III Clinical Skills Examination Candidate Guide, described the skills to be performed at each of the four stations and offered related instructions and guidance. ECF 102-1, at 4 ¶ 22; ECF 122, at 10–11 ¶¶ 41–43; ECF 123, at 4 ¶ 12, at 5 ¶ 18. Candidates also had access to the Evaluation Forms for each of the four stations, which set forth in more detail the skills to be performed in each Station and the numbered procedural elements within each skill that were

---

[4] The sole difference in scoring the CSE for a candidate who had any extended time was that the examiners scoring the videos of the candidates in each station were told that the candidate's video was longer and that they should score the entire video. ECF 102-1, at 11 ¶ 72.

graded.  ECF 102-1, at 5 ¶ 23; ECF 122, at 11 ¶ 45; ECF 123, at 4 ¶ 13.  Additionally, the Clinical Skills Site Information and Equipment List explained and included photographs of various equipment, solutions, and supplies that were in the examination rooms.  ECF 122, at 11 ¶ 47; ECF 117, at 164:6–8.  NBEO encouraged candidates to review the online materials prior to taking the CSE.  ECF 122, at 11 ¶ 46.

1.    Station 1

i.    *Skill 1: Case History/Patient Communication*

The first skill in Station 1 of the CSE involved taking a patient history.  ECF 102-1, at 5 ¶ 25; ECF 122, at 15 ¶ 59.  Taking a patient history required candidates to ask the standardized patient what their chief complaint was and ask appropriate questions to elicit specific information to make a tentative diagnosis.  ECF 122, at 15 ¶ 59.

Candidates were provided with a patient data form that provided basic information about the standardized patient.  ECF 122, at 16 ¶ 63; ECF 123, at 22–24 ¶ 193; Joint Ex. 28 (patient data form).  While the form provided background information and limited information about the chief complaint for which the patient sought an exam, the candidate had to ask additional questions regarding the patient's history and the patient's complaint in order to solicit information not included on the form.  ECF 123, at 35 ¶ 201.  Although an example form was provided to candidates ahead of time on NBEO's website, the form provided during the test contained information specific to the standardized patient and was not provided ahead of time.  ECF 123, at 24 ¶ 195.

Questions did not appear on the patient data form.  *See* ECF 122, at 16 ¶ 63; ECF 123, at 35 ¶ 201. However, in some cases, candidates were expected to ask questions that could be derived from the form, such as asking what particular substance is used by a patient who marked "yes" to the question "Do you use tobacco, alcohol, and/or recreational drugs?"  Joint Ex. 28, at 1; ECF

123, at 35–36 ¶ 203; *see also* Joint Ex. 29, at 2 (listing possible questions appropriate to ask the standardized patient during Skill 1, including "type of substance used?" and "frequency and amount of substance that is used?"). Many questions that candidates were expected to ask were not necessarily derived from the patient data form. *See* Joint Ex. 29, at 1–2; *see also* ECF 123, at 36 ¶ 205.

### ii. Skill 2: Patient Education

Skill 2 required the candidate to ask the standardized patient whether the patient had any questions, to which the standardized patient was instructed to ask a question unrelated to the information obtained in Skill 1, and the candidate was then required to answer and educate the standardized patient. ECF 122, at 17–18 ¶ 64; ECF 123, at 37 ¶ 212.

### iii. Skill 3: Near Cover Test and Near Point of Convergence Test

Skill 3 involved the candidate performing two tests, the Near Cover test and the Near Point of Convergence test. *See* ECF 122, at 17–18; ECF 123, at 37 ¶ 214. The Near Cover test required the candidate to assess eye alignment. ECF 122, at 17 ¶ 68. To perform this skill, the candidate asked the standardized patient to focus on a target the candidate had identified and held in front of the patient (approximately 40 centimeters away). ECF 122, at 17 ¶ 68; ECF 117, at 87:17–88:17; Joint Ex. 29, at 2. The candidate then covered one of the patient's eyes with a paddle and observed the movement in the uncovered eye. ECF 122, at 17 ¶ 68; ECF 117, at 87:17–88:17; Joint Ex. 29, at 2. The candidate then used a numbered prism to measure the direction of the eye. ECF 117, at 87:25–88:8; *see also* ECF 123, at 37–38 ¶ 214.

To perform the Near Point of Convergence test, the candidate asked the standardized patient to focus on a letter on a ruler. ECF 122, at 18 ¶ 71; ECF 123, at 38 ¶ 215. In doing so, candidates had to identify the letter on the ruler that the standardized patient needed to focus on. ECF 122, at 18 ¶ 70. Then, the candidate gradually moved the ruler closer to the standardized

6

patient's face and asked the patient to state when they saw double, otherwise known as the "break point," and moved the ruler further away to determine when the patient saw a single image again, otherwise known as the "recovery." ECF 123, at 38 ¶ 216; ECF 117, at 88:25–89:1.

> iv. *Skill 4: Binocular Extraocular Muscle Motility and Binocular Horizontal Saccadic Eye Movement Evaluations*

Skill 4 required candidates to evaluate both Binocular Extraocular Muscle Motility and Binocular Horizontal Saccadic Eye Movement. *See* ECF 122, at 18 ¶ 74; Joint Ex. 33, at 1; ECF 117, at 92:9–14, 93:1–10. The Binocular Horizontal Saccadic Eye Movement evaluation requires the candidate to evaluate the speed and accuracy of rapid, simultaneous eye movement between two horizontal targets by observing the movement of the eye when the standardized patient is asked to look between two rods held in front of them. ECF 122, at 18 ¶ 74. The Binocular Extraocular Muscle Motility evaluation requires the candidate to observe the standardized patient's eye movement as the patient follows a target in six cardinal positions. ECF 122, at 19 ¶ 77; ECF 117, at 181:23–182:17.

> v. *Skill 5: Static Peripheral Confrontation Visual Fields*

Skill 5 involved the Static Peripheral Confrontation Visual Fields examination, which required a candidate to assess the standardized patient's side vision by having the patient identify the number of fingers held up in different visual fields. ECF 122, at 19 ¶ 80; ECF 117, at 183.

> vi. *Skill 6: Pupil Testing*

Skill 6 required candidates to measure the size of the pupil of a standardized patient and observe how the pupil reacted to different lighting. ECF 122, at 20 ¶ 84. To measure the pupil, candidates held up a ruler marked with simulated pupils and matched the observed pupil to the corresponding size on the ruler. ECF 117, at 184:5–19, 191:8–12.

*vii. Skill 7: Blood Pressure Measurement*

Skill 7 involved performing a standard blood pressure measurement on an artificial arm, rather than a live patient. ECF 122, at 21 ¶ 88. As part of measuring the blood pressure, candidates necessarily had to identify numbers on the blood pressure gauge. ECF 122, at 21 ¶ 89; ECF 123, at 39 ¶ 219; ECF 117, at 94:6–10 ("Again, I read the numbers on the cuff.").

*viii. Skill 8: Ophthalmic Lens Evaluation*

Skill 8 involved an Ophthalmic Lens Evaluation, otherwise known as Lensometry. *See* ECF 122, at 21 ¶ 91. To perform this skill, the candidate determined the prescription of two different pairs of glasses, or four lenses in total, by placing the glasses lens in the manual lensometer and then turning dials to get an estimation of the prescription. ECF 122, at 21 ¶ 91; ECF 117, at 33:20–21, 193:2–20. Using the lensometer, candidates took several measurements and filled out a form to record the measurements. Joint Ex. 29, at 4; ECF 117, at 124:17–18, 169:22–23.

2.     Station 2

*i. Skill 9: Biomicroscopy*

Skill 9 involved a Biomicroscopy, also known as a slit lamp exam. ECF 122, at 22 ¶ 94. To perform this skill, a candidate had to look into the eye of a standardized patient through a microscope, called a slit lamp, and evaluate the overall health of the front of the eye. ECF 122, at 22 ¶ 94. Candidates were then required to properly examine and accurately describe different parts of the eye. Joint Ex. 30, at 1. In performing the skill, candidates had to identify a number on the slit lamp. *See* ECF 117, at 196:22–25. There was a camera mounted on the slit lamp so the examiner could see what the candidate was observing. ECF 117, at 196:1–5.

### ii. *Skill 10: Goldman Applanation Tonometry*

Skill 10, Goldmann Applanation Tonometry, required candidates to measure a standardized patient's internal eye pressure. ECF 122, at 23 ¶ 97. After putting numbing drops in the standardized patient's eye, the candidate used a probe, attached to the slit lamp, to apply slight pressure to the cornea to register a numerical pressure reading. ECF 122, at 23 ¶ 97. Candidates had to identify a number on the slit lamp and set the pressure on the probe during their performance of the skill. ECF 117, at 200:1–11.

### iii. *Skill 11: Three-Mirror Gonioscopy*

Skill 11 required candidates to perform a Three-Mirror Gonioscopy. ECF 122, at 23 ¶ 100. In performing that skill, a candidate puts numbing drops into a standardized patient's eye, places a special gonio lens against the eye, and then views the eye through the slit lamp to view the eye at different angles. ECF 122, at 23 ¶ 100; ECF 123, at 41 ¶ 235; *see also* ECF 117, at 40:21–41:7, 200:23–201:15. The candidate needed to obtain clear images of, and accurately describe, different parts of the eye in performing the skill. Joint Ex. 30, at 2.

### iv. *Skill 12: Collagen Implant Insertion and Removal*

Skill 12 involved candidates performing a Collagen Implant Insertion and Removal, which is a procedure used to treat dry eye. ECF 122, at 24 ¶ 103. To perform the skill, the candidate used small forceps to insert collagen plugs, also known as "punctal" plugs, into the standardized patient's tear duct to stop drainage and keep moisture in the eye. ECF 122, at 24 ¶ 103; *see also* ECF 117, at 210:17–211:14. Candidates set up the magnification on the microscope before performing the skill, and they also instructed the standardized patient to put their chin on the chin rest and head against the bar before the procedure began. ECF 117, at 106:14–107:10.

v.  *Skill 13: Soft and GP Contact Lens Insertion, Evaluation, and Removal*

To perform Skill 13, candidates inserted a soft contact lens in one eye of the standardized patient and inserted a hard contact lens in the other eye, and then observed the eye through the slit lamp to confirm the proper fit. ECF 122, at 25 ¶ 107; Joint Ex. 30, at 3; *see also* ECF 117, at 108:16–109:15. Prior to inserting the lenses in the eye, candidates needed to inspect the lenses by holding them up to the light to make sure there were no tears, blemishes, or foreign objects on the lenses. ECF 117, at 212:18–213:4. Candidates also had to apply different solutions to the lenses prior to their insertion in the patient's eye. *See, e.g.*, ECF 117, at 218–19. The soft contact lens packets were visually distinguishable from the hard contact lens cases. ECF 122, at 25 ¶ 110.

3.    Station 3

i.  *Skill 14: Retinoscopy*

Skill 14, Retinoscopy, involved an objective refraction evaluation in which the candidate used a hand-held retinoscope to shine light through a phoropter into the standardized patient's eye to view how the light reacted, and thus to determine the degree of refractive error and whether the patient was nearsighted or farsighted. ECF 122, at 27 ¶ 114. The skill is used to obtain a prescription for eyeglasses or contact lenses without any subjective input from the patient. ECF 122, at 27 ¶ 114.

To begin the skill, the candidate asked the standardized patient to focus on a letter on a wall a set distance away. ECF 117, at 221:18–22. The candidate then measured the distance between the patient's pupils and entered that measurement into the phoropter. ECF 123, at 42 ¶ 241. To do so, the candidate turned dials on the phoropter to the measured distance. ECF 123, at 42 ¶ 242–43; Joint Ex. 31; ECF 117, at 222:18–20. Then, the candidate had to identify the number of "clicks" needed to correctly direct light through the lens into the patient's retina, with one click equaling .25 diopters. ECF 123, at 42–43 ¶¶ 244–45. The candidate took that total and subtracted

10

their working distance from the measured prescription. *See* ECF 117, at 110:14–111:3. The candidate then compared the measured prescription to the patient's chart containing the actual prescription. ECF 123, at 43 ¶ 246.

### ii. *Skill 15: Distance Subjective Refraction*

Skill 15, Distance Subjective Refraction, required candidates to ask the standardized patient to view an eye chart while looking through a phoropter, based on the findings obtained in Skill 14. ECF 122, at 28 ¶ 117. Candidates then had to confirm whether the patient correctly identified the letters on the eye chart and asked for their input as to whether letters on the chart were clearer based on changing the settings on the phoropter. *See* ECF 117, at 226:1–14.

### iii. *Skill 16: Heterophoria and Vergence Testing at Distance*

Skill 16 involved two forms of testing, Vergence Testing at Distance and Heterophoria testing. *See* ECF 122, at 28–29 ¶¶ 120–23. To perform Vergence Testing at Distance, the candidate had the standardized patient look at a letter in the distance, and then the candidate changed lenses in the phoropter and instructed the patient to state at which point the view was blurry, when the patient saw double, and when the patient saw a single letter again. ECF 122, at 28 ¶ 120. Candidates added two numbers together when the patient indicated the break and recovery points to measure the vergence. Joint Ex. 31, at 2; ECF 117, at 117:9–18, 228:10–20.

In performing Heterophoria testing, candidates asked the standardized patient to identify at what point targets on an acuity chart were vertically aligned (like buttons on a shirt) and at what point they were horizontally aligned (like headlights on a car). ECF 122, at 29 ¶ 123; ECF 123, at 43 ¶ 249; ECF 117, at 229:9–19. In doing so, candidates had to measure and state aloud the horizontal and vertical phoria at distance, specifying the eye and directionality. Joint Ex. 33, at 3; ECF 123, at 43 ¶¶ 249–50. Candidates identified numbers associated with the alignment, added

them together, and divided by two to get the required measurement.  ECF 117, at 116:9–20, 229:23–24.

### iv.  *Skill 17: Accommodation Testing*

In Skill 17, candidates had the standardized patient view a grid on a near point card through the phoropter, and then as the candidate adjusted dials on the phoropter, the standardized patient was instructed to state what point the vertical lines and horizonal lines on the grid were equally clear.  ECF 122, at 30 ¶ 126; ECF 117, at 230:18–12.  Like the Retinoscopy, as the candidate added or removed lenses until the patient experienced clarity, the candidate counted "clicks," each equal to .25 diopters, and took that final number from the prescription.  ECF 117, at 231:11–232:13.  Prior to beginning the skill, the candidate had to accurately position and illuminate the near point card appropriately.  Joint Ex. 31, at 3.

### 4.  Station 4

### i.  *Skill 18: Binocular Indirect Ophthalmoscopy*

To perform Skill 18, the Binocular Indirect Ophthalmoscopy, candidates used a "BIO" headset and a condensing lens to evaluate the health of the back of one eye of a standardized patient.  ECF 122, at 30 ¶ 129.  Candidates' goal was to evaluate the back of the eye for any retinal tears, holes, or detachments, and to state those findings.  ECF 122, at 30–31 ¶ 129; Joint Ex. 33, at 4; ECF 117, at 121:13–25.  Prior to beginning the observation of the eye, candidates needed to calibrate the headset and lens using the distance between the patient's pupils.  *See* ECF 117, at 122:5–16.

### ii.  *Skill 19: Dilated Biomicroscopy and Non-Contact Fundus Lens*

Skill 19 involved candidates performing a Dilated Biomicroscopy and Non-Contact Fundus Lens evaluation.  ECF 122, at 31 ¶ 132.  To complete the skill, a candidate evaluated the back of the eye by looking through the slit lamp and a different hand-held lens, assessing

conditions such as macular degeneration. ECF 122, at 31 ¶ 132. Candidates had to state the structures they observed throughout the viewing process. Joint Ex. 33, at 4. After the examination, candidates were required to educate the patient regarding a given hypothetical finding. Joint Ex. 33, at 4.

### B.    Halig's Disabilities

Halig is an Illinois resident and a 2020 graduate of the Illinois College of Optometry ("ICO"). ECF 123, at 3 ¶ 1. Halig is diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), a specific learning disability in math, a specific learning disability in reading, and an adjustment disorder with mixed depression and anxiety. ECF 123, at 8 ¶ 40; ECF 117, at 27:22–25, 28:1. Halig's disabilities have the capability to exacerbate each other, and generally slow her ability to read, perform math, and switch tasks. ECF 117, at 91:6–16.

Halig was first diagnosed with a disability when she was a child and received accommodations throughout her primary and secondary education. ECF 117, at 28:5–9. Halig has received extended time and other accommodations on standardized exams specifically, receiving time and half and a separate testing room on the Scholastic Aptitude Test ("SAT"); time and half, a separate room and breaks within sessions on the Graduate Record Exam ("GRE"); and double time and a separate room on the Optometry Admission Test ("OAT"), the admissions test utilized for optometry school. ECF 122, at 3 ¶ 2; ECF 123, at 9 ¶ 46.

As a graduate student at Georgia Tech, Halig received extended time on assignments and tests, testing in a separate room, as well as breaks, snacks, and a notetaker for classes. ECF 117, at 28:10–15. Halig also received disability accommodations while she was enrolled at ICO, including notetakers, snacks, breaks, and extended time on labs, clinics, externships, classes, and exams. ECF 123, at 28 ¶¶ 47–48; *see also* ECF 122, at 3 ¶ 2. ICO initially denied Halig's request to provide double time for assignments and testing, instead providing time and a half. ECF 123,

at 9 ¶ 49. Halig was dismissed from ICO in 2017 for academic performance reasons. ECF 117, at 143:11–144:7. However, ICO later readmitted Halig and granted the double time accommodation and a mentor pursuant to a settlement arising from a lawsuit Halig filed alleging that ICO violated the ADA. ECF 122, at 3–4 ¶¶ 6–9, ECF 117, at 146:15–23. Halig thus received double time at ICO during her clinical rotations. ECF 123, at 10 ¶ 53; ECF 117, at 29:1–5. Halig also received double time accommodations for externships after her readmission to ICO. ECF 117, at 29:1–5, 31:3–17. Specifically, Halig received double time for charting—while students typically had to have their charts completed the same day they examined a patient, Halig was permitted to submit her charts the next day. ECF 117, at 32:8–11, 42:22–43:3.

In 2017, as part of the settlement agreement with ICO, Halig underwent an evaluation by licensed clinical psychologist Dr. Joshua Wolff to support her request for accommodations at ICO. ECF 102-1, at 6 ¶ 33; ECF 122, at 4 ¶ 8, at 12 ¶ 67, at 13 ¶ 73; ECF 117, at 144:21–23. Dr. Wolff completed a Psychoeducational Evaluation of Halig on November 30, 2017. ECF 122 at 4 ¶ 8. As part of his evaluation, Dr. Wolff administered a number of standardized tests, comparing Halig's performance to others in the same age group, and also collected and reviewed collateral information, including prior evaluations, medical records, her transcript from ICO, accommodation information for past standardized tests, information from Halig herself, and information from individuals who know her well. ECF 123, at 14 ¶ 79; ECF 119, at 8:22–9:16.

Dr. Wolff's report noted that the evaluation results indicated weakness in working memory compared to other adults her age, which was more pronounced when Halig was asked to engage with new information, as well as significant impairments in math fluency and reading speed, accuracy, and sentence recall. ECF 123, at 16 ¶ 94. Dr. Wolff's report also noted that an opportunity to practice or rehearse information dramatically improved Halig's performance and a

14

brief delay allowed her to consolidate information. ECF 123, at 17 ¶ 95. Dr. Wolff reached several diagnostic impressions on account of his evaluation, including ADHD, a specific learning disorder with impairment in mathematics, a specific learning disorder with impairment in reading, and an adjustment disorder, with mixed anxiety and depressed mood. ECF 119, at 9:19–10:8, 11:3–15, 12:25–13:11, 15:9–13.

Specifically, Dr. Wolff observed that Halig's ADHD manifested in difficulties with reading fluency, such as skipping words in a passage, in working memory deficits, in difficulty organizing auditory information in a way that was most efficient, and in task switching. ECF 119, at 10:12–25, 28:25–29:23. Dr. Wolff evaluated Halig's working memory on a variety of tests, including one in which she was given a long list of words and then told to repeat them back to him. ECF 119, at 20:15–21:24. Dr. Wolff noted that Halig was a standard deviation below other adults her age in her performance on that test until she had the opportunity to rehearse and consolidate the information, at which point her score increased to the median. ECF 119, at 21:17–24.

Dr. Wolff also observed Halig's mathematics learning disorder manifest in issues with accurate or fluent calculation—*i.e.*, remembering mathematic rules and applying them in the right order. ECF 119, at 11:16–12:17. For example, Dr. Wolff administered an arithmetic subtest to Halig, in which she had to pay attention to long word math problems.[5] ECF 119, at 35:1–20. Although Dr. Wolff noted that there was a math component involved, the core of the subtest measured attending and listening to information, and one's ability to discard irrelevant details. ECF 119, at 35:17–36:5. Dr. Wolff further observed Halig's impairment in reading manifest by

---

[5] As an example, Dr. Wolff provided the following problem at trial: "Jack goes to the grocery store and buys five apples. Jill goes to the store and buys six pears. Steve goes to the store and buy nine oranges. How many fruits were purchased in total?" ECF 119, at 35:17–20.

15

affecting her ability to accurately put together letters and words efficiently—*i.e.*, her reading rate or fluency. ECF 119, at 12:25–13:11. For example, Dr. Wolff asked Halig to read passages out loud as part of an academic achievement test and observed that she would sometimes skip words or not fully attend to their meaning. ECF 119, at 14:20–24. Finally, Dr. Wolff observed Halig's judgment disorder manifest in the form of nervousness and needing reassurance throughout the evaluation. ECF 119, at 15:25–16:7.

Dr. Wolff's report recommended, in addition to breaks, that Halig receive double time for all academic work, including exams, laboratory exercises, graded materials, and homework assignments. ECF 119, at 25:4–11, 32:15–19. Although Dr. Wolff's recommendation made reference to the "NBEO exams," he testified that he did not have information about the NBEO licensure examination beyond what he gleaned from NBEO's website. *See* ECF 119, at 30:1–22.

## C. Halig's Requests for Accommodations

Halig requested and received accommodations from NBEO on all three parts of the optometry licensure exam. NBEO granted her requests for accommodations in full for Parts I and II, but it denied her request for the CSE and instead offered alternative accommodations.[6] This case revolves around that denial.

---

[6] NBEO devotes a portion of its subsequent briefing to whether it engaged in the "interactive process" under the ADA. *See* ECF 122, at 56–48. In the employment discrimination context, the Fourth Circuit has noted that "an employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process." *Walter v. United Airlines, Inc.*, 232 F.3d 892, at *4 (4th Cir. 2000) (table) (citing *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000)). "Rather, the employee must demonstrate that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee." *Id.* Even assuming that framework applies to claims brought under 42 U.S.C. § 12189, Halig did not advance arguments at trial, in her post-trial briefing, or throughout this litigation generally regarding how the interactive process itself (or any lack thereof) resulted in failing to identify an appropriate accommodation for Halig. More fundamentally, however, and as the Court explains herein, Halig has failed to show that the accommodation she requested was required under § 12189.

Candidates seeking disability accommodations on NBEO exams must submit a request form that allows candidates to outline the accommodations requested and the basis for their request. ECF 123, at 6 ¶ 26. NBEO requires that candidates seeking an accommodation have documentation of their disability submitted directly from their evaluator or health care professional. ECF 123, at 6 ¶ 28. Documentation must include a diagnosis, the degree of severity, the procedures and clinical or laboratory data used to determine the diagnosis, and a specific recommendation and justification for the test accommodations being requested. ECF 123, at 6 ¶ 129.

On November 4, 2018, Halig submitted a request to NBEO for double time as an accommodation for Part I of the optometry licensure exam. ECF 102-1, at 3 ¶ 8; ECF 122, at 5 ¶ 16; ECF 123, at 24 ¶ 144. In support of Halig's request, Dr. Wolff submitted his 2017 evaluation. ECF 102-1, at 8 ¶ 50; ECF 122, at 5 ¶ 17; ECF 123, at 26 ¶ 146. On or about February 5, 2019, Richard Present, NBEO's Director of Part I Exam Development and ADA Coordinator at the time, consulted with Dr. Kathryn Bugbee, the then-consultant to NBEO for reviewing accommodation requests, and asked her to review Halig's request and recommend a response. ECF 102-1, at 9 ¶¶ 54–56; ECF 122, at 6 ¶ 18; ECF 123, at 6 ¶ 30, at 7 ¶¶ 31, 33–34. Dr. Bugbee has a Ph.D. in clinical psychology, is employed by the Association of American Medical Colleges, and is the Director of Accommodation Services for the Medical College Admissions Test ("MCAT"), where she is responsible for reviewing and deciding accommodation requests made by MCAT test takers. ECF 122, at 6 ¶ 18; ECF 123, at 7 ¶ 34.

Mr. Present made several requests for additional documentation from Halig, including Dr. Halig's history of standardized test accommodations on the SAT, GRE, and OAT; her SAT, GRE, and OAT scores; information about her accommodations in school dating back to college; proof

17

of the accommodations she received at ICO; her ICO transcript; an explanation of the changes in her accommodations at ICO; and the evaluations from 2008 and 2013 that Dr. Wolff's report indicated he had reviewed, among other things. ECF 102-1, at 8–9 ¶ 52; ECF 123, at 26–27 ¶ 48. Mr. Present forwarded to Dr. Bugbee Halig's college transcript, OAT scores, and the 2017 evaluation by Dr. Wolff, and provided Dr. Bugbee with some information regarding accommodations Halig received on the OAT and at ICO. ECF 102-1, at 9 ¶ 57.

Dr. Bugbee informed Mr. Present that she believed Halig's documentation supported the need for double time and breaks between testing sections on Part I. ECF 102-1, at 9 ¶ 58; ECF 122, at 7 ¶ 22. Accordingly, NBEO granted Halig double time, testing over two days, a separate room for testing, and the ability to bring snacks and a drink into the testing room as accommodations for Part I. ECF 102-1, at 9–10 ¶ 59; ECF 122, at 7 ¶¶ 22–23; ECF 123, at 27 ¶ 154. Halig made an accommodation request for Part II based on the same documentation in July of 2019. ECF 123, at 28 ¶ 156. NBEO granted the same accommodations to Halig for Part II. ECF 123, at 28 ¶ 157. Halig took both Part I and Part II with the granted accommodations and passed both exams. ECF 123, at 28 ¶ 158; *see also* ECF 122, at 7 ¶¶ 23, 25–26.

In August of 2020, Halig completed an accommodation request for double time on the CSE. ECF 102-1, at 5 ¶ 26; ECF 122, at 32 ¶¶ 135, 137; ECF 123, at 28 ¶ 159. The accommodation request form submitted by Halig stated, "See evaluation," referring to the 2017 psychoeducational evaluation from Dr. Wolff in support of her request for an accommodation on Part I of the licensure examination. ECF 102-1, at 5 ¶ 27; ECF 122, at 32 ¶ 136; ECF 123, at 28 ¶ 160. Mr. Present consulted with Dr. Bugbee concerning Halig's request for double time on the CSE and asked for her recommendation. ECF 102-1, at 5 ¶ 28. Pursuant to Dr. Bugbee's recommendation, NBEO did not grant Halig extended time to perform the clinical skills within each of the four Stations of

18

the Clinical Skills Examination. ECF 102-1, at 5 ¶ 29. Instead, on August 27, 2020, Halig was informed that NBEO would offer her one of two alternative accommodations: (1) to either have Station 4 as her second station, which would result in a 15-minute break halfway through the exam, or (2) to have longer breaks of 15 minutes between all of the stations. ECF 102-1, at 4 ¶ 17, at 10 ¶ 66; ECF 122, at 32–33 ¶ 139. In connection with her second and third attempts at the CSE in March 2022 and August 2022, respectively, Halig submitted similar requests and was offered the same accommodations from NBEO. ECF 122, at 33 ¶¶ 140–41; ECF 123, at 31–32 ¶¶ 181–82.

Halig attempted and failed the CSE three times.[7] ECF 102-1, at 5–6 ¶¶ 30–32; ECF 122, at 26–35 ¶¶ 155–60; ECF 123, at 32 ¶ 184. In her attempts, Halig did not always finish the skills she was required to perform. *See, e.g.*, ECF 117, at 95:14. On her first attempt in March of 2021, Halig took the CSE without any accommodations. ECF 102-1, at 10 ¶ 67. On her second attempt in March of 2022, and on her third attempt in August of 2022, Halig elected to receive the longer breaks between each station and took the CSE with this accommodation. ECF 102-1, at 11 ¶ 69; ECF 122, at 33 ¶ 143, at 36–37 ¶¶ 156–60. Prior to her attempts, Halig reviewed the materials NBEO made available on their website. ECF 122, at 12 ¶ 49; ECF 117, at 164:6–17. Halig testified that she did not need to read the instructions provided in the examination rooms during the CSE, and the videos of her performances reflect that she did not, because she was already familiar with the instructions. ECF 122, at 14–15 ¶ 57. Overall, the CSE required minimal reading and math from Halig, and Halig did not experience significant delays during portions of the exam that involved those skills. *See* Def. Exs. 15, 17, and 18 (videos of Halig's attempts at the CSE).

---

[7] The NBEO permitted candidates to take the CSE up to six times. Def. Ex. 82, at 1.

## II.    CREDIBILITY ANALYSIS

Before proceeding to its conclusions of law, this Court pauses to explain the credibility determinations underlying the findings of fact described above. This Court credited most of the testimony of the witnesses at trial, but it did not credit some components of Halig's testimony. While the Court does not believe Halig had any intent to deceive, the Court found implausible some of her statements regarding her past accommodations related to clinical work and externships at ICO. For example, Halig testified that she saw "thousands" of patients during her practical education, and at least a "thousand" before her third year at ICO. ECF 117, at 30:18–21. Halig also testified that she worked 40 hours a week at her externships and received double time for patient exams and for charting. ECF 117, at 31:20–22, 32:8–11, 42:24–43:3. But when asked whether that meant she was seeing less patients than other students in the context of those clinical and externship experiences, Halig testified that she did not see less, and "actually sometimes saw more than the other students." ECF 117, at 43:7–12.

This assertion is difficult for the Court to square with Halig's other testimony about how many hours she worked and what tasks she received double time for during her clinical and practical experiences. For example, Halig testified that at one of her externships, students typically had 30 minutes to see patients, but she received an hour. See ECF 117, at 43:7–24. But in the context of a 40-hour work week, which Halig testified was the length of the week she typically worked, see ECF 117, at 31:20–22, 32:9–11, it is difficult to understand how Halig could have seen more patients than other students. Halig's explanation that she sometimes came in earlier or later to "chart," ECF 117, at 43:8–9, does not clarify this discrepancy. Beyond her own testimony, Halig presented no evidence to the Court of how her double time clinical accommodations operated at ICO and called no witnesses who observed or implemented her accommodations there. That is especially troubling to the Court in light of the fact that Halig's accommodations at ICO

20

arose from a settlement agreement, rather than ICO's independent determination that such accommodations were warranted. *See Coulibaly v. J.P. Morgan Chase Bank, N.A.*, Civ. No. DKC-10-3517, 2011 WL 3476994, at *9 (D. Md. Aug. 8, 2011) ("[P]arties settle for a myriad of reasons too numerous to describe in detail here. . . . '[it] costs time, trouble and money to defend even an unfounded claim.'" (quoting *Georgia Ry. & Elec. Co. v. Wallace & Co.*, 50 S.E. 478, 480 (Ga. 1905))). To be clear, the Court does not conclude that Halig is insincere in her recollection. But Halig has failed to explain the inconsistencies in her testimony with respect to the accommodations she received in the context of her clinical and externship experiences. In weighing the evidence, the Court considers those inconsistencies.

### III. CONCLUSIONS OF LAW

Plaintiff brings her claim under Title III of the ADA. *See* ECF 1, at 12 ¶ 81 ("The ADA, 42 U.S.C. § 12189, requires the NBEO to offer these examinations in a manner accessible to persons with disabilities."); *id.* at 13 ¶ 89 ("The NBEO has discriminated, and continues to discriminate, against Dr. Halig . . . in violation of the ADA, specifically, 42 U.S.C. § 12182."). 42 U.S.C. § 12182(a) provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." The ADA defines "discrimination," in relevant part, as "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." *Id.* § 12182(b)(2)(A)(ii).

With respect to professional examinations in particular, a separate provision of Title III applies, and it provides that "[a]ny person that offers examinations . . . related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189; *see also Patel v. Educ. Comm'n for Foreign Med. Graduates*, No. 22-1651, 2023 WL 3336646, at *2 (3d Cir. May 10, 2023) ("[I]n the context of ADA claims involving examinations, courts must apply the more specific [§ 12189], rather than the general provisions of [§ 12182]." (citing *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 154–55 (3d Cir. 1999)). Section 12189 applies to NBEO because it is an entity that "offers examinations or courses related to . . . certification, or credentialing for . . . professional . . . purposes." 42 U.S.C. § 12189; *Rawdin v. Am. Bd. of Pediatrics*, 582 F. App'x 114, 118 (3d Cir. 2014).

The implementing regulation of § 12189 repeats its general standard: that "[a]ny private entity that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 28 C.F.R. § 36.309(a). However, the regulation further provides that an examination covered by this section must be

> selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)[.]

22

*Id.* § 36.309(b)(1)(i); *see also id.* § 36.309(b)(2) ("Required modifications to an examination may include changes in the length of time permitted for completion . . . ."). Some federal courts had previously held that § 36.309(b)(1)(i)'s "best ensure" standard was entitled to *Chevron* deference in light of the ambiguity in the phrases "accessible" and "alternative accessible arrangements" as used in § 12189. *See Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1161–62 (9th Cir. 2011); *Bonnette v. D.C. Ct. of Appeals*, 796 F. Supp. 2d 164, 180–81 (D.D.C. 2011); *Rawdin v. Am. Bd. of Pediatrics*, 582 F. App'x 114, 118 n.9 (3d Cir. 2014).

However, after the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 413 (2024), the Court "need not . . . defer to an agency interpretation of the law simply because a statute is ambiguous." "Absent eligibility for *Chevron* deference, agency interpretations are only 'given a level of respect commensurate with their persuasiveness.'" *Perez v. Cuccinelli*, 949 F.3d 865, 877 (4th Cir. 2020) (quoting *Ramirez v. Sessions*, 887 F.3d 693, 701 (4th Cir. 2018)); *Nicoletti v. Bayless*, No. 24-6012, 2025 WL 80294, at *2 (4th Cir. Jan. 13, 2025) ("The Supreme Court's decision in *Loper Bright* does not appear to impact the framework established in *Skidmore* [*v. Swift & Co.*, 323 U.S. 134 (1944)].") Nevertheless, "agency interpretations may be 'especially informative to the extent [they] rest[ ] on factual premises within [the agency's] expertise . . . [because the] Executive Branch [has] power to persuade, if lacking power to control." *Zalmai v. Josephs-Conway*, No. 1:24-CV-497 (PTG/WBP), 2025 WL 938619, at *8 (E.D. Va. Mar. 27, 2025) (cleaned up) (quoting *Loper Bright*, 603 U.S. at 402).

The parties' proposed conclusions of law present new legal arguments about the extent to which the Court should give deference to § 12189's implementing regulation, 28 C.F.R. § 36.309, and its "best ensure" standard. *See* ECF 122, at 51–56 (arguing that the Court is not bound by agency regulations under the Supreme Court's decision in *Loper Bright*, and should at most give

23

the regulation deference as persuasive pursuant to *Skidmore*).  The Supreme Court's decision in *Loper Bright* was issued on June 28, 2024, four days before the Court issued its summary judgment opinion in this case on July 1, 2024.  *See* ECF 63.

The Court recognizes that, as a practical matter, the parties could not have presented arguments regarding the deference owed to § 36.309 prior to the issuance of its summary judgment opinion.  However, proposed conclusions of law are not normally the forum in which to present novel legal arguments resulting from a change in controlling law.  *Cf. Glob. Digital Sols., Inc. v. Grupo Rontan Electro Metalurgica, S.A.*, Civ. No. 1880106, 2021 WL 921053, at *4 n.1 (S.D. Fla. Feb. 3, 2021) ("Defendants were afforded ample opportunity to raise this argument . . . and they failed to do so. They cannot now, for the first time in their proposed findings of fact and conclusions of law, put forward new substantive legal arguments. Moreover, even if Defendants had timely raised this argument, I have effectively ruled on this issue already."), *aff'd*, No. 21-10716, 2022 WL 16736939 (11th Cir. Nov. 7, 2022).  Rather, that is generally a purpose of a motion for reconsideration, and no such motion was filed in this case.  *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003) (in assessing district court's denial of reconsideration of a nonfinal judgment, noting that such power "is committed to the discretion of the district court" and observing that "doctrines such as law of the case . . . have evolved as a means of guiding that discretion"); *cf. Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007) (noting that a Rule 59(e) motion allows a court to alter or amend a judgment "(1) to *accommodate an intervening change in controlling law*; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice" (emphasis added) (quoting *Ingle v. Yelton*, 439 F.3d 191, 197 (4th Cir. 2006))).

24

The Court has already held that the "higher education-specific failure-to-accommodate standard applies in this case."[8] *Halig v. Nat'l Bd. of Examiners of Optometry, Inc.*, Civ. No. BAH-22-2118, 2024 WL 3253561, at *10 (D. Md. July 1, 2024). "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (alteration added) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). Indeed, this is the standard under which Halig presented her case in chief at trial. *See* ECF 117, at 13:14–23 ("[T]his is a case about the reasonableness of the accommodations that were requested . . . ."). As such, to prove her claim, Halig had to show that she "(1) is disabled; (2) is 'otherwise qualified' academically; and (3) requested a reasonable accommodation that would not fundamentally alter the nature of the defendant's service." *Hoppe v. Coll. of Notre Dame of Md.*, 835 F. Supp. 2d 26, 32 (D. Md. 2011) (citing *Mershon v. St. Louis*

---

[8] Since the summary judgment opinion was issued, the Court has become aware of decisions from courts of other circuits holding that the reasonable accommodation standard does not apply to cases arising under § 12189. *See Rawdin v. Am. Bd. of Pediatrics*, 582 F. App'x 114, 188 n.7 (3d Cir. 2014) (first citing *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1162 (9th Cir. 2011); then citing *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 155 (3d Cir. 1999); and then citing *Bonnette v. D.C. Court of Appeals*, 796 F.Supp.2d 164, 182 (D.D.C.2011)). However, pursuant to the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). "[T]he Fourth Circuit has recognized three exceptions to the law-of-the-case doctrine: (1) when a subsequent trial produces substantially different evidence, (2) when controlling authority has since made a contrary decision of law applicable to the issue, and (3) when the prior decision was clearly erroneous and would work manifest injustice." *Pond v. United States*, No. 1:21CV83, 2025 WL 2163918 (M.D.N.C. July 30, 2025) (alteration added) (citing *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009)). The Court has not identified a Fourth Circuit decision which squarely recognizes the appropriate standard applicable to cases arising under § 12189. Moreover, the Court's prior holding regarding the applicability of "reasonableness" did not dispense with the textual requirements of § 12189 or its implementing "best ensure" regulation in 28 C.F.R. § 36.309(1)(i). *See Halig*, 2024 WL 3253561, at *10. The Court would come to the same conclusion based on an application of the plain text of § 12189 and § 36.309's "best ensure" standard for the reasons explained herein. Accordingly, the Court does not abandon its earlier holding on this issue.

*Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006)).  In this case, only the third element remains at issue. *See Halig*, 2024 WL 3253561, at \*12–13 (holding that Halig is disabled under the ADA and was otherwise qualified to take the CSE).  The Court thus makes its conclusions of law with respect to that element of Halig's claim, relying on the text of § 12189 and the standard announced in the Court's prior opinion to reach its result.[9] *See Halig*, 2024 WL 3253561, at \*10.

NBEO was required to offer its examinations "in a place and manner accessible to persons with disabilities" or to "offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189.  As discussed, the Court concluded that accessibility should be analyzed under a "reasonableness" framework in its prior opinion.  *See Halig*, 2024 WL 3253561, at \*10. "Reasonableness is generally a fact-specific inquiry, asking whether the specific modification is 'reasonable under the circumstances.'" *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 674 (4th Cir. 2019) (internal citation omitted) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001)); *see also Enyart*, 630 F.3d at 1164–65 ("[O]ur analysis depends on the individual circumstances of each case, requiring a 'fact-specific, individualized analysis of the

---

[9] Even if the Court was not bound by its prior ruling and could consider, with the benefit of more robust briefing, the extent to which the "best ensure" standard in § 36.309 affected the governing standard for §12189 cases after *Loper Bright*, the Court has some doubts about whether such a standard is consistent with the plain text of § 12189.  The New Oxford American Dictionary defines "accessible" as, most relevantly, "able to be reached or entered by people who have a disability." *Accessible*, New Oxford American Dictionary (3d ed. 2010); *see also Accessible*, Oxford English Dictionary (rev'd 2011) ("Capable of being conveniently used or accessed by people with disabilities; of or designating goods, services, or facilities designed to meet the needs of disabled people.").  It is not so clear that the plain meaning of "accessible" requires the "best" possible means of ensuring that an individual's aptitude or achievement level is reflected on an examination. *See Elder v. Nat'l Conf. of Bar Examiners*, No. C-11-00199-SI, 2011 WL 672662, at \*8 (N.D. Cal. Feb. 16, 2011) (noting that the late Judge Motz of this Court "interpreted 'accessible' under section 12189 to mean only 'reasonably accessible,' and not the higher 'best ensures' standard adopted by the Ninth Circuit in *Enyart*").  However, because the Court applies the standard it adopted at summary judgment, it does not address the matter further.

·disabled individual's circumstances.'" (quoting *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999).)).[10]  "A modification is reasonable if it is 'reasonable on its face' or used 'ordinarily or in the run of cases' and will not cause 'undue hardship.'" *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016); *see also Krpan v. Registry of Interpreters for the Deaf Inc.*, 167 F. Supp. 3d 774, 791 (E.D. Va. 2016) ("An accommodation under the ADA causes an undue burden 'when it requires significant difficulties or expense when considered in light of a number of factors, including the type of service or product being offered.'" (quoting *Rawdin*, 985 F. Supp. 2d at 656)).

Plain and simple, Halig has not shown that her specifically requested accommodation of double time on the CSE was reasonable such that it was necessary to make the CSE "accessible" to her. *See* 42 U.S.C. § 12189.  In addition to herself, Halig called two witnesses at trial—one

---

[10] "Courts 'ordinarily' defer to the 'professional, academic judgments of educational institutions[.]'" *Bahl v. New York Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 683 F. Supp. 3d 224, 236 (E.D.N.Y. 2023) (quoting *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 191 (2d Cir. 2015)).  Some courts have found that testing entities are entitled to this deference as well as more traditional academic institutions. *See Rawdin*, 985 F. Supp. 2d at 654–55 ("[The defendant] is an academic institution in that it awards a credential based on testing and evaluation of candidates, and just as educational institutions are granted deference regarding ·accommodations that would devalue an academic degree, so too should [the defendant] be granted deference regarding accommodations that would devalue certification.").  "Nevertheless, judicial deference to the academic decisions is not absolute, as deference only attaches to decisions evincing some amount of reasoned consideration or professional judgment." *Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1233 (S.D. Fla. 2010).  A court need not defer to an academic institution "where the record 'is devoid of evidence' showing that an institution evaluated a potential accommodation's effectiveness and potential for undue hardship or a substantial modification." *Bahl*, 683 F. Supp. 3d at 236 (citing *Dean*, 804 F.3d at 191).  And if a decision on accommodations is "plainly · not based on professional judgment," it is not entitled to deference. *Forbes*, 768 F. Supp. 2d at 1231.  As the Court previously held, because it is not clear that Dr. Bugbee based her recommendation on Plaintiff's requested accommodations on an accurate consideration of the effectiveness of the requested accommodations on the CSE specifically or that she considered whether those accommodations would pose an undue burden or fundamental alteration to the CSE, the Court does not defer to Defendant's determinations regarding Plaintiff's accommodations. *See Halig*, 2024 WL 3253561, at *14.

expert witness and one lay witness—neither of whom had direct knowledge of, or expertise related to, the CSE. *Cf. Bonnette*, 796 F. Supp. 2d at 174, 185 (holding that the plaintiff was likely to succeed on the merits of a § 12189 claim where plaintiff produced "several experts who have evaluated her personally and whose professional opinion is that [the plaintiff] would be disadvantaged if she were required to use either a human reader or an audio CD *for the MBE*," with one expert explaining "that the complexity of the process necessary to solve questions on the MBE makes it essential for [plaintiff] to have facilities that are of nearly equivalent functionality as those afforded to a sighted reader" (emphasis added)).

Halig's expert witness on disability accommodations in higher education, Jamie Axelrod, is the Director of Disability Resources at Northern Arizona University. ECF 118, at 50:1–3, 52:21–53:17–21. Though unquestionably a credible witness with a significant and distinguished history providing accommodations for students with disabilities, Mr. Axelrod has no education, training, skill, knowledge, or experience *relating to optometry* or independent knowledge *of the CSE*, beyond publicly available resources such as NBEO's website and what he learned by speaking with Halig. ECF 118, at 55:6–23, 69:13–22, 69:23–70:14, 70:23–71:8. Additionally, Mr. Axelrod does not have expert knowledge of Halig's specific disabilities, other than from reading the materials Halig provided, nor direct knowledge of whether or how her disabilities manifested with respect to particular optometric clinical skills. ECF 118, at 73:18–75:9 ("Q. You have no idea whether she had any difficulty performing any of those skills during the course of the exam, do you? A: I don't").

Mr. Axelrod does have significant experience, however, in reviewing accommodations for students in the clinical health sciences program at Northern Arizona University. ECF 118, at 60:1–8. At trial, Mr. Axelrod described his process for considering accommodation requests for clinical

examinations, noting the fact-specific nature of the accommodation inquiry. *See* ECF 118, at 60–61. Mr. Axelrod noted that in making an accommodations determination with respect to clinical exams, it may be the case that there are parts of a clinical exam where additional time can be provided and parts where it cannot. ECF 118, at 16:13–16. Based on his review of the accommodations NBEO offered Halig, Mr. Axelrod testified that he believed the extended breaks between the stations were reasonable in relationship to the amount of mental effort Halig reported that she required to engage in some of the skills. *See* ECF 118, at 65:11–24. Mr. Axelrod testified, however, that extended breaks between stations may not sufficiently address issues around automaticity—or a kind of effortless recall, as Mr. Axelrod described—and "fluency related to the actual [] tasks happening in the stations themselves." ECF 118, at 56:21–24; 65:15–18. However, while Mr. Axelrod was able to opine on that point as a general matter, he has never served as Halig's evaluating professional or physician with respect to her specific disabilities, nor did he have expertise regarding the particular skills involved in and tested on the CSE.

As discussed above, Halig also called Dr. Wolff to the stand, though not as an expert witness. Dr. Wolff testified about the psychoeducational evaluation he completed for Halig in 2017. *See* ECF 119, at 8:22–9:16. Like Mr. Axelrod, Dr. Wolff did not have expertise or independent knowledge of the NBEO exams apart from what he learned from Halig and from NBEO's website. *See* ECF 119, at 30:9–19. Dr. Wolff's evaluation was based on information from Halig, past evaluations and records, other individuals in Halig's life, and a number of standardized tests Dr. Wolff performed. ECF 123, at 14 ¶ 79; ECF 119, at 8:22–9:16. Dr. Wolff's testimony reflected that his testing involved Halig performing certain multi-step math and reading problems. ECF 119, at 14:20–24, 35:1–20. Dr. Wolff's testimony made clear that the standardized testing he performed was not meant to mirror a clinical setting, and Dr. Wolff was not able to opine

about how the skills measured in his evaluation mapped onto the CSE. *Cf. Kitchens*, 2023 WL 7230400, at *16 (finding that plaintiff was entitled to accommodations on future medical examination steps, which were multiple choice tests, where evaluating expert "testified that timed standardized examinations can exacerbate ADHD symptoms and reported that [plaintiff]'s ADHD symptoms [were] *directly linked* to his inability to complete the USMLE" (emphasis added)); *D'Amico v. New York State Bd. of L. Examiners*, 813 F. Supp. 217, 222 (W.D.N.Y. 1993) (finding sufficient likelihood of success on merits of a § 12189 claim where evaluating physician "found that the exam schedule given plaintiff in July, which allowed her more time on each exam day, from 7:30 a.m. to 5:45 p.m. 'exacerbated her visual impairment'").

Although the Court found Mr. Axelrod and Dr. Wolff's testimony credible, Halig was effectively missing a witness to testify about the CSE itself and to describe how the skills implicated on the test overlapped with her disabilities. The Court needed such a witness to understand how Halig's disabilities manifested on the exam such that double time was necessary to make the CSE accessible to her, beyond the accommodation that she received.[11] Of course, Halig was able to provide her own testimony regarding her experience taking the CSE. But Halig's descriptions of the stations and skills involved in the exam, in addition to the joint exhibits

---

[11] Halig argues that Title III does not require candidates to provide documentation from someone who is also an expert in the specific exam for which they seek accommodations. *See* ECF 123, at 56. In reaching its conclusion, the Court does not hold that such documentation, or even an expert about the exam at issue, was per se required for Halig to succeed in bringing a Title III claim. *See D'Amico*, 813 F. Supp. at 223 ("It would be ludicrous if the physician was limited to simply describing the patient's medical condition without stating an opinion about the patient's ability to perform certain physical or mental tasks that are affected by the disability."). Rather, the Court observes that the evidence adduced by Halig in this case failed to persuasively explain how the CSE implicated skills that her disabilities impacted such that double time was necessary to make the exam accessible to her. An expert or witness with direct knowledge of the CSE, or an expert who had at least thoroughly considered the skills tested on the exam in developing an opinion on Halig's disabilities and requested accommodations, could have aided Halig in meeting her burden.

describing the exam and including exam materials, leads the Court to conclude that Halig has failed to show that the CSE involved an amount of reading or math that would necessitate double time to accommodate her disabilities. Indeed, several skills involved no reading or math whatsoever. For example, Skill 18, binocular indirect ophthalmoscopy, involved observing and assessing the back of the eye, which Halig admitted involved no reading or math. *See, e.g.*, ECF 117, at 236:20–237:1. To be sure, some stations and skills did involve basic reading or math. Skill 1 of the CSE involved some reading with respect to the patient data form.[12] But the remainder of the skills required reading only insofar as Halig had to identify a single letter or number on a chart, ruler, or machine.[13] *See, e.g.*, ECF 117, at 154:1–15, 193:11–20. Although reading a single letter or number is reading in the most technical sense, it is not reflective of the testing which formed the basis of Halig's psychoeducational evaluation.

Some of the skills involved a small amount of math—addition, subtraction, or multiplication by a factor of 10 to convert, for example, a single digit on the slit lamp into millimeters of mercury, *see, e.g.*, ECF 117, at 200:1–12—as a part of using equipment and taking appropriate measurements. Halig identified Skill 8, Ophthalmic Lens Evaluation, or lensometry, as involving the "most math." ECF 117, at 94:11–12; ECF 223, at 39 ¶¶ 221–25. But even with respect to that skill, the Court never heard about the specifics of the calculations involved in

---

[12] Even with respect to the patient data form, however, Halig did not testify a trial that she was required to read the form, only that doing so at the beginning of Skill 1 was difficult for her. *See* ECF 117, at 85:17–86:9. However, the Station 1 Evaluation Form indicates that the candidate must "confirm" certain information, information which appears to come from the patient data form. *See* Joint Ex. 29, at 1–2.

[13] Instructions in the exam room were available to be read on a laptop, but those instructions were provided to candidates ahead of time. *See* ECF 122, at 14 ¶ 57; ECF 123, at 5 ¶ 17. Additionally, Halig testified that she did not read the instructions in the room. ECF 117, at 162:10–16, 168:2–11, 173:17–174:9.

31

ascertaining the various powers inside of the lenses. ECF 117, at 94:11–25. Rather, Halig only testified that ascertaining those measurements using the lensometer involved addition and subtraction for each of four lenses. ECF 117, at 94:11–95:7. Neither did the admitted exhibits illuminate the amount of math involved in the station. The Station 1 Evaluation Form, for example, reflects that candidates had to determine distances and various values, but it does not identify how candidates reach that result. *See* Joint Ex. 29, at 4. Neither do the Station 1 Instructions to Candidates provide clarification about what calculations are involved in the evaluation of the pairs of ophthalmic glasses. *See* Joint Ex. 33, at 1. Beyond Halig's assertion that addition and subtraction were required, the Court was not provided with evidence of what the calculation entailed, how the lensometer factored in, or a definite and credible description of how Halig's disabilities affected her performance of the tested skill.

Moreover, the Court notes that the conduct Halig exhibited at trial, during her deposition, and while actually taking the CSE fail to support the contention that she requires double time to complete the minimal reading and math-related tasks on the CSE. The Court closely observed Halig during trial and in the video evidence presented of her taking the CSE, and notes that Halig did not display detectable hesitancy or delay with respect to reading or math. For example, Halig was asked by her own counsel to read aloud words and passages from emails and documents throughout trial and did so accurately, clearly, fluently, and without any pause or delay. *See, e.g.,* ECF 117, at 47:15–48:15, 67:8–18, 132:12–24. Additionally, a portion of Halig's deposition played at trial showed Halig reading aloud from a patient data form without any noticeable delay. *See* ECF 117, at 153:4–154:9; *see also* ECF 117, at 154:7–155:24 (identifying letters on an eye chart at deposition without noticeable delay). In testifying about the math she performed during different skills, Halig also demonstrated an ability to do some of that math without any noticeable

delay. *Id.* at 114:11–115:2. For example, when the Court asked Halig how a retinoscopy required her to perform math, she performed a calculation without hesitation:

> So the prescription, I get, let's say, let's make it sphere to make it easy. So the prescription, so it's a two, right, and my working distance is 50 centimeters. Which if you divide one over the centimeters will give you, like, two diopters, two and a half. Then you take that and you subtract it from the two of the prescription, and that will make it my minus .50 and that's the prescription.

*Id.* at 114:17–23. The Court then confirmed with Halig that the type of calculation she successfully completed in the courtroom was "the type of math" asked of her on the exam, and she responded affirmatively. *Id.* at 114:24–115:1.

Halig also testified that during Skill 1 in Station 1 (the skill the Court agrees with Halig involved the most reading) "you still have to read the medical history, the ocular history, the family history, last eye exam, if they wear glasses or contact lenses. . . . You still have to read all that." *Id.* at 80:14–23. However, recordings of Halig's attempt at Skill 1 during the CSE show Halig fluently engaging with the standardized patient while she reads and interacts with the form with no noticeable impact to her reading or speaking speed, and thus no noticeable delay in completing the skill. *See, e.g.,* Def. Ex. 15, 1A-Front, at 1:32–5:09. This was a common theme in Halig's testimony and the video evidence.[14]  In one exchange with the Court, when asked how long it

---

[14] For example, Halig at one point looks down at the sheet, underlines a portion, and states, "It says here glaucoma. Who in your family has glaucoma?" Def. Ex. 15, 1A-Front, 3:17–27. Halig's scan of the sheet, underline, and question occur all within the span of ten seconds. *Id.* Halig's use of the form to ask questions of the standardized patient and record responses during her March 11, 2021 attempt at the CSE constitute approximately three minutes and 37 seconds of Station 1, for which Halig had a total of 30 minutes to complete. *See id.* Halig's March 18, 2022 attempt lasted longer, but Halig similarly is shown fluently engaging with the information on the form and the information provided by the patient throughout her attempt at the skill. *See* Def. Ex. 17, 1A-Front, at 2:05–8:16. Indeed, before providing her tentative diagnosis, Halig looks down again at the form and summarizes her notes on the standardized patient's description of their condition without meaningful hesitation. *See id.* at 7:56–8:10; *see also* Def. Ex. 18, 1A-Front, at 1:52–8:25 (Halig performing Skill 1 during her August 26, 2022 attempt).

33

would take Halig to perform certain CSE math and reading skills, she responded "I don't know how long it takes me. . . . I've never measured the time." ECF 117, at 228:21–229:4. As such, video evidence of Halig's performances on the CSE, in addition to her conduct at trial and in her videotaped deposition presented at trial, fail to buttress Halig's general assertions about the extent to which her disabilities slowed her ability to engage in the skills implicated on the CSE.

Although the Court concludes that only minimal reading and math are involved in the CSE, it seems clear that task switching is abundant in the exam, which involves the performance of 19 skills with multiple sub-steps across four stations. It is thus possible that Halig's own testimony about the exam could have sufficed to connect the dots between the CSE and the reasonableness of her request for *some* additional time. However, Halig struggled to articulate at trial how any difficulties with task-switching manifested itself on the CSE. For example, defense counsel showed Halig a video of her transition between skills during the CSE and asked her whether she had difficulty with the transition. *See* ECF 117, at 206:22–208:5. Halig stated in response that she "was very stressed" and that "[s]tress is a problem with the transition," *id.* at 208:1–2, but the Court did not observe—and Halig did not articulate—how that stress tangibly impacted her ability to perform the tested skill in the time required. Later, Halig conceded that she did not have difficulty with a transition. *See id.* at 209:24–210:1. Further, the Court did not observe Halig significantly pause or delay her performance of a skill or transition once during its review of her videotaped performances on the CSE. Stated plainly, the testimony Halig provided about the CSE and her disabilities was too vague to demonstrate why a *double time* accommodation was a reasonable request, or one that would make the CSE accessible to her in light of her disabilities.

To be clear, the Court does not identify those instances to undermine the conclusion that Halig, in fact, is disabled, an issue which the Court previously decided. *See Halig*, 2024 WL

3253561, at *12; *see also Kitchens v. United States Med. Licensing Examination*, Civ. No. 22-3301, 2023 WL 7230400 (E.D. Pa. Oct. 31, 2023) (observing that "it is not the court's function to infer a person's medical condition based on their behavior in the . . . courtroom"). Additionally, the Court recognizes that the circumstances of testifying at trial are meaningfully distinct from those which Halig faced under the timed pressure of the CSE. However, given the Court's observations of Halig, her testimony simply failed to substitute for the missing evidence needed to establish how her disabilities impacted her ability to perform the skills—reading, math, and task switching—that she testified were implicated on the CSE in the time provided. *See U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 824 (4th Cir. 1992) ("The trial court is uniquely qualified to determine which witnesses are most credible and to resolve conflicts among witnesses' testimony, for the simple reason that it has the benefit of observing the witnesses, and is thereby 'aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'" (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985))). That is especially true with respect to the Court's impressions of the video evidence presented at trial, which show Halig actually performing skills during her attempts at the CSE, and Halig's testimony related to those videos. The Court thus concludes that Halig failed to advance a consistent and coherent narrative about how her disabilities manifested on the CSE, which informs the Court's determination of what was required to make the CSE accessible to her.

Accordingly, the Court concludes that it needed further evidence—beyond Halig's vague and sometimes incredible assertions—regarding how her disabilities interacted with the skills tested on the CSE to conclude that Halig's requested accommodation of double time was reasonable under Title III of the ADA. *Cf. Enyart*, 630 F.3d at 1165 (finding a likelihood of success on the merits of a § 12189 claim where plaintiff provided evidence that she could "only

use CCTV for about *five minutes* before becoming nauseated and disoriented" so "the only way" she could fully comprehend material she read is if she was "able to simultaneously listen to and see magnified test material" (emphasis added)).

Moreover, Halig presented additional evidence at trial that actually weighed against the assertion that her requested accommodation was reasonable in light of her disabilities. In particular, Dr. Wolff testified that the effect of Halig's disabilities improved dramatically once she had the ability to rehearse and consolidate information. *See* ECF 123, at 17 ¶ 95. The CSE, unlike standard multiple-choice examinations, offered the opportunity to practice and rehearse the skills and information tested by providing immensely detailed materials and instructions to candidates ahead of time on NBEO's website, which Halig confirms she reviewed repeatedly. *See* ECF 122, at 12 ¶ 49, at 14–15 ¶ 57; ECF 117, at 164:6–17. Moreover, Halig testified that she had the opportunity to perform the skills tested on the CSE on "thousands" of patients throughout her clinical rotations and externships. *See* ECF 117, at 30:18–21.

Nevertheless, Halig's evidence of past accommodations offered in clinical settings, including double time, could offer evidence of the reasonableness of such an accommodation here. *See* 28 C.F.R. § 36.309(1)(v) ("When considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations . . . ."). However, the majority of Halig's double time accommodations, including during the optometry licensure examination process, were granted for multiple-choice and written examinations based on reading and math. Although Halig testified that she received double time accommodations for her clinical work and externships at ICO, the Court finds that such accommodations were primarily for Halig's charting, given the inconsistencies in her testimony.

related to double time for patient exams. *See* ECF 117, at 32:8–11, 42:22–43:3. And it is unclear how such accommodations in that context relate to the particular skills tested on the CSE, or to the purpose of the CSE, which is to ensure that a candidate is ready for practice outside of the educational context.[15]  Furthermore, the Court cannot ignore that double time accommodations at ICO arose as a result of a settlement agreement from a previous lawsuit. *See Coulibaly*, 2011 WL 3476994, at *9 ("[P]arties settle for a myriad of reasons too numerous to describe in detail here. . . . '[it] costs time, trouble and money to defend even an unfounded claim.'" (quoting *Georgia Ry. & Elec. Co. v. Wallace & Co.*, 50 S.E. 478, 480 (Ga. 1905))). ICO's decision to settle Halig's lawsuit and the terms of the settlement, could have been driven by any number of reasons, and accordingly do not carry much persuasive power here. *See Emcor Grp., Inc. v. Great Am. Ins. Co.*, Civ. No. ELH-12-0142, 2013 WL 1315029, at *26 (D. Md. Mar. 27, 2013) (discussing multiple reasons why a settlement may not be probative of a given assertion). By failing to produce a witness capable of testifying about the skills involved in and tested by the CSE, Halig has not explained why a clinical *educational* setting in which she received prior accommodations is an adequate comparator to the CSE, a *licensure* exam designed to test whether a candidate is ready to independently practice optometry. *Cf. Jones v. Nat'l Conf. of Bar Examiners*, 801 F. Supp. 2d 270, 288 (D. Vt. 2011) ("Plaintiff's experts collectively offered credible and persuasive testimony

---

[15] Neither has the Court been presented with enough information to conclude that accommodations offered to other candidates on the CSE supported the reasonableness of those Halig requested. Halig contends that portions of her post-trial supplemented deposition designations support that "NBEO has offered extended time to other candidates." ECF 123, at 77. However, the evidence cited does not provide detail about the accommodations except for one candidate, who was apparently provided less than double time and whose disability was not analogous to Halig's disabilities. *See* ECF 115-1 (deposition of Richard Present), at 35–26, 112:17–113:17 (confirming only that extended time had been given in the past but providing no particulars); ECF 115-1 (deposition of Elizabeth Cody), at 142, 38:4–40:5 (describing that a candidate with a speech impediment received "50 percent more time in station one and 25 percent more time in stations two, three and four").

in support of Plaintiff's requested accommodations and fully explained why Defendant's proffered accommodations are inadequate.").

For all those reasons, the Court concludes that Halig has failed to meet her burden of proving that her requested accommodation of double time on the CSE was reasonable, such that it was necessary to make the optometry licensure examination accessible to her. Rather, the Court concludes that Halig's evidence supports that the accommodations NBEO did offer "best ensure[d]" that the examination would "accurately reflect" Halig's aptitude to accurately and efficiently perform optometric skills rather than reflecting the disabilities she has described to the Court. *See* 28 C.F.R. § 36.309(b)(1)(i). NBEO granted Halig's request for double time, among other accommodations, on Parts I and II of the optometry licensure examination, two multiple-choice examinations which turn entirely on a candidate's reading comprehension and math skills. *See* ECF 122, at 5 ¶ 13; ECF 123, at 4 ¶ 7. But Part III was not like Parts I and II, and Halig's disabilities were not implicated by the skills tested in Part III in the same way. Accordingly, NBEO offered 15 minutes breaks between stations as its accommodation for Halig on Part III, or a reorganization of the stations resulting in a longer break halfway through the examination, which reflected the additional mental effort Halig had to exert during the CSE in light of her anxiety disorder and the stress she experienced during task-switching. *See* ECF 102-1, at 4 ¶ 17, 10 ¶ 66; ECF 122, at 32–33 ¶ 139. Because Halig has not convinced the Court that any more was needed to make the CSE accessible to her, the Court enters judgment in favor of NBEO.

## IV.   CONCLUSION

For the foregoing reasons, judgment will be entered in favor of NBEO. A separate order of judgment will issue.

Dated: March 25, 2026

/s/
Brendan A. Hurson
United States District Judge

38